**NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al., Appellants,**

v.

**Richard B. CHENEY, Secretary of Defense, et al.**

No. 88–5271.

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1989.

Decided Aug. 25, 1989.

Joshua F. Bowers, Washington, D.C., with whom H. Stephan Gordon was on the brief, for appellants.

Nathan Dodell, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, and R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellees.

Before MIKVA, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Circuit Judge MIKVA.

SENTELLE, Circuit Judge:

Appellants, the National Federation of Federal Employees and Local 273 of the National Federation of Federal Employees (collectively "appellants" or "NFFE"), contest a United States Army decision to "contract out" to private contractors the services formerly provided by government employees of the Directorate of Logistics, Fort Sill, Oklahoma. The District Court held from the bench: (1) that NFFE, pursuant to section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (1982), lacked standing to sue under either Office of Management and Budget ("OMB") Circular A–76 (Revised) or section 1223(b) of the National Defense Authorization Act of 1987 ("1987 DoD Authorization Act")[1]; and (2) that administrative decisions to contract out are not subject to judicial review under the APA, 5 U.S.C. § 701(a). We affirm the District Court's holding that NFFE lacks standing to bring this action and therefore find it unnecessary to address the reviewability of contracting out decisions.

## I. BACKGROUND

Under OMB guidelines, government agencies must determine "whether commercial activities should be performed under contract with commercial sources or in-house using Government facilities and personnel." OMB Circular A–76 (Revised) para. 1 (August 4, 1983) ("OMB Circular A–76").[2] In 1980, the U.S. Army Training and Doctrine Command ("TRADOC"), pursuant to the Circular, directed the Fort Sill Directorate of Resource Management ("Fort Sill") to conduct a commercial activity review of the Fort Sill Directorate of Logistics. The Directorate of Logistics provides support, maintenance, transportation, and supply functions for Fort Sill and surrounding installations. It also operates and maintains a fleet of 500 government vehicles.

---

1. Pub.L. No. 99–661, § 1223(b), 100 Stat. 3977 (codified at 10 U.S.C. § 2304 note (Supp. V 1987)).

2. OMB Circular A–76 was originally issued in 1966 and subsequently was revised in 1967, 1979, and 1983. *See* OMB Circular A–76 (Revised) para. 4.b. (August 4, 1983). The Circular summarized a policy of the Bureau of the Budget developed in Bureau Bulletins issued in 1955, 1957, and 1960. *Id.* The 1983 Circular revision is the focus of this appeal.

Over the next four years, Fort Sill conducted an extensive examination of the responsibilities of the Directorate of Logistics, separating "commercial" and "governmental" activities and formulating all the commercial activities into a Performance Work Standard ("PWS") for a projected five-year contract term. Fort Sill then determined the in-house Most Efficient Organization ("MEO") costs based upon the PWS. With this estimate as a baseline, and with other appropriate adjustments,[3] in November 1984, Fort Sill issued a solicitation for bids, referred to as a Request for Proposals ("RFP"), from private contractors to provide the services at that time provided by the Directorate of Logistics based on the same PWS used for the in-house estimate.

In response to the RFP, in May 1986, Fort Sill received eight contractor proposals, all of which were evaluated by an Army Source Selection Evaluation Board ("Evaluation Board"). As is typical in government contracting, the Evaluation Board met with officials from the eight contractors for "discussions" regarding improvements on their proposals. After these discussions, Fort Sill resolicited bids seeking the contractors' best and final offers ("bafos"). The bafo proposals were received in July 1986.

In August, the OMB revised its policy regarding calculation of retirement costs for in-house estimates. Likewise in February 1987, the method of determining costs of a contractors' social security and thrift plan contributions was revised. Based on these changes, TRADOC solicited a second round of bafo bids. All second round bafo proposals were audited by the Defense Contract Audit Agency.

In May of 1987, the Evaluation Board selected the proposal submitted by Northrup Worldwide Aircraft Services, Inc. ("Northrup"). In June, Fort Sill compared the selected Northrup proposal, estimated at $53.2 million over the five-year term, with the in-house MEO estimate of $61.4 million over the same period. After TRADOC approval of the selection, Fort Sill announced tentatively an award of the contract to Northrup, which necessarily would result in termination of in-house services.

Pursuant to federal and Army acquisition regulations and OMB Circular A–76, an administrative appeal period ran from June 10 to July 22. During the period NFFE directly and through its members [4] appealed the award, alleging several violations of the OMB Circular A–76 Cost Comparison Handbook, including, *inter alia*, inflated in-house employee performance costs, artificially high overhead and support costs, and improperly calculated private contractor conversion costs and profit provisions.[5] An Army Administrative Appeals Review Board ("Review Board") consolidated the allegations into eleven appeals and in a fifty-four page decision letter specifically addressed each of fifty-nine allegations, denying most, partially substantiating two, and fully substantiating two others. Administrative App.Rev.Bd., Solic. No. DABT39–85–R–0001, Report of Proceedings, para. 2.b. (August 7, 1987) (J.A. at 338, 339). The Review Board concluded that the "directed changes were not enough to alter the announced result of the cost comparison or to reverse the initial decision to contract out." *Id.* para. 4.b. (J.A. at 391).

The Government Accounting Office ("GAO"), pursuant to a congressional request, also reviewed the Fort Sill contracting out decision. Based on the conclusions

3. Most significantly, OMB Circular A–76 requires a ten percent conversion differential be added to contracting costs.

4. TRADOC received, *inter alia*, 330 letters of concern from the NFFE and Directorate of Logistics employees and another 1,131 letters of concern from non-Directorate employees. Joint Appendix ("J.A.") at 338–39.

5. Local 273 of the NFFE also filed a collective bargaining grievance with Fort Sill. *See* J.A. at 508. At oral argument before this Court, appellants advised that the grievance had been withdrawn. Additionally, several union member employees filed a bid protest with the General Accounting Office under the Competition in Contracting Act, Pub.L. No. 98–369, 98 Stat. 1175 (codified in various sections of Titles 10 and 41 U.S.C., *see* J.A. at 512).

of that review, on December 4, 1987, the Department of the Army directed TRADOC to negotiate a contract change with Northrup to correct a defect in the award fee provision. After completion of this correction, on March 15, 1988, Fort Sill received final approval to award the contract to Northrup, with performance scheduled to begin on October 1, 1988.

Appellants then filed this suit alleging, *inter alia*, that Fort Sill, in its contracting out decision, violated the cost comparison procedures set forth in OMB Circular A–76 and the requirements of section 1223(b) of the 1987 DoD Authorization Act.[6] Appellants sought injunctive and other relief as necessary and proper.[7]

Appellees moved to dismiss. The District Court granted appellees' motion from the bench, holding that (1) under section 702 of the APA and the "zone of interest test" appellants lacked standing to sue; and (2) under 5 U.S.C. § 701(a) the contracting out decision was not subject to judicial review under either the Circular or the 1987 DoD Authorization Act, as the former commits the decision to nonreviewable agency discretion and the latter fails to provide any law or ascertainable standards to apply. Transcript of Hearing, *Na-* *tional Fed'n of Fed. Employees v. Carlucci* at 2–3 (D.D.C. Aug. 10, 1988), J.A. at 8–9. On appeal, appellants seek reversal of the District Court's decision on standing and remand for adjudication on the merits.

## II. ANALYSIS

### A. *APA Standing: The Zone of Interest of the Relevant Statutes.*

A party must have standing to bring suit in federal court. A court may "refuse to determine the merits of a legal claim, on the ground that even though the claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination." 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531, at 338–39 (1984). Standing focuses on the party and not on the issues sought to be adjudicated. *See Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). The requirements of standing are generally separated into two categories: the constitutional requirements of Article III[8] and the prudential requirements crafted by the Judiciary. *See generally, Center for Auto Safety v. National Hwy. Traffic Safety Admin.*, 793 F.2d 1322, 1328–38 (D.C.Cir.

---

**6.** Section 1223(b) provides:

For the purpose of determining whether to contract with a source in the private sector for the performance of any Department of Defense function on the basis of a comparison of the costs of procuring supplies or services from such a source with the costs of providing the same supplies or service by the Department of Defense, the Secretary of Defense shall ensure that all costs considered, including the costs of quality assurance, technical monitoring of the performance of such function, liability insurance, employee retirement and disability benefits, and all other overhead costs, are realistic and fair.

10 U.S.C. § 2304 note.

**7.** Appellants also argued that a Northrup employee's conflict of interest arising from his prior employment with the Army, where he allegedly had some involvement in this contracting out decision, should void the award. Because appellants failed to raise this allegation in their complaint before the District Court, the issue was not before that Court and therefore is not properly before us.

**8.** Article III requires an actual "Case[ ]" or "Controvers[y]" for standing. U.S. CONST art.

III, § 2 cl. 1. In *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Supreme Court wrote that "at an irreducible minimum" this equates to an " '[1] actual or threatened injury as a result of the putatively illegal conduct of the defendant' ... '[2] fairly ... trace[able] to the challenged action' and ... '[3] likely ... redress[able] by a favorable decision.' " *Id.* at 472, 102 S.Ct. at 758 (citations omitted). Thus injury without traceability and redressability does not satisfy Article III. *See National Maritime Union of America v. Commander, Military Sealift Command*, 824 F.2d 1228, 1235 (D.C.Cir. 1987) (government contractor's employees' "loss of present or future jobs" as a result of contract award to other contractor constituted economic injury but was "neither fairly traceable to the putatively illegal omission of a wage determination [under the Contract Services Act] ... nor fairly redressable by the remedy [sought]"). Because we hold that appellants lacks standing on zone of interest grounds, we find it unnecessary to determine if appellants in fact suffered a traceable and redressable injury.

1986). Prudential standing requires that the "plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (footnote omitted)).

In the instant case, appellants assert standing under section 702 of the APA. That section provides standing to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a *relevant statute*." 5 U.S.C. § 702 (emphasis added). Section 702 and the prudential zone of interest test are intimately related—the former provides a statutory grant from Congress to an aggrieved party to contest agency action and the latter provides a judicial limitation necessary to ensure that the proper party is asserting the claim against the agency. As the Supreme Court has stated, the zone of interest test is "most usefully understood as a gloss on the meaning of [section] 702," particularly since the "principal cases in which the ... test has been applied are those involving claims under the APA." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 758 n. 16, 93 L.Ed.2d 757 (1987).

Thus, we are required to determine whether appellants' interests bring them within "that class of 'aggrieved' persons ... entitled to judicial review of 'agency action.' " *Association of Data Processing*, 397 U.S. at 157, 90 S.Ct. at 832, by the "relevant statute[s]," 5 U.S.C. § 702, under which the agency acted, thereby conferring upon appellants standing to sue. The statutes under which appellants assert standing are (1) the two statutes under which OMB Circular A–76 is purported to be au-

thorized, the Budget and Accounting Act of 1921, as amended,[9] and the Office of Federal Procurement Policy Act Amendments of 1979,[10] *see* OMB Circular A–76 para. 3 (J.A. at 12); and (2) section 1223(b) of the 1987 DoD Authorization Act, 10 U.S.C. § 2304 note, requiring a "realistic and fair" cost comparison in a decision to contract out.[11]

In *Clarke*, the most recent and leading Supreme Court statement on the zone of interest test, Justice White, writing for the Court, explained that

> [t]he zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency decision presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency action. In cases where the plaintiff is not itself the subject of the contested ... action, the test denies a right of review if the plaintiff's interests are *so marginally related to or inconsistent with the purposes implicit in the [relevant] statute* that it cannot reasonably be assumed that Congress intended to permit the suit.

479 U.S. at 399, 107 S.Ct. at 757 (emphasis added). *Clarke* held that the interest of the Securities Industry Association, a trade association representing securities dealers, was "plausibl[y] relat[ed] to the policies underlying ... the National Bank Act," and therefore the Association had standing under that Act to contest an action of the Comptroller of the Currency. *Id.* at 403, 107 S.Ct. at 759.

The Court noted that the "test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399–400, 107 S.Ct. at 757 (footnote and citation omitted). The *Clarke* Court expressly rejected earlier lower court suggestions that the zone of interest test requires "indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 400 n. 15, 107 S.Ct. at 757

---

**9.** Act of June 10, 1921, ch. 18, 42 Stat. 20 (1921) (codified at 31 U.S.C. § 1 *et seq.*).

**10.** Pub.L. No. 96–83, 93 Stat. 648 (1979) (codified at 41 U.S.C. § 401 *et seq.*).

**11.** *See supra* note 6.

n. 15 (citing *Control Data Corp. v. Baldrige*, 655 F.2d 283, 293–94 (D.C.Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981)). Instead, the *Clarke* formulation of the zone of interest test requires that we deny standing only if appellants' interest is no more than marginally related to or in fact inconsistent with the implicit purposes of the relevant statute. If, after reviewing the relevant statute and its legislative history, we conclude that appellants' interests are consistent with and more than marginally related to the purposes of the relevant statute, appellants have standing to contest an agency action under section 702.

■ Before undertaking our zone of interest inquiry, we must address the parties' fundamental misunderstanding of the relevant question. The issue is *not* whether appellants' interests are within the zone of interest of OMB Circular A–76; section 702 clearly requires that the party seeking relief be "legal[ly] wrong[ed] ..., or adversely affected or aggrieved ... within the meaning of a *relevant statute.*" 5 U.S.C. § 702 (emphasis added). The Circular is not a statute, *see, e.g.*, Ketler, *Federal Employee Challenges to Contracting Out: Is There a Viable Forum?*, 111 MILITARY L.REV. 103, 110 (1986) ("Circular A–76 promulgates executive branch managerial policy"), and, although promulgated pursuant to congressional authority, the Circular itself cannot grant standing. In *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Supreme

Court stated that where a dispute is otherwise justiciable by an Article III federal court [12] under section 702 of the APA, "the question whether the litigant is a 'proper party to request an adjudication of a particular issue' ... is one within the power of Congress to determine." *Id.* at 732 & n. 3, 92 S.Ct. at 1364 & n. 3 (quoting *Flast v. Cohen*, 392 U.S. at 100, 88 S.Ct. at 1953, other citations omitted). *See also Association of Data Processing Service Orgs. v. Camp*, 397 U.S. at 154, 90 S.Ct. at 830 ("Congress can, of course, resolve the question [of standing] one way or another, save as the requirements of Article III dictate otherwise.") (citation omitted); *State of Alaska v. Department of Transp.*, 868 F.2d 441, 444 (D.C.Cir.1989); *Center for Auto Safety*, 793 F.2d at 1335 (Congress may, by legislation, expand standing to the full extent permitted by Article III, thus permitting litigation by one who otherwise would be barred by prudential standing rule, 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE, § 24:5, at 226 (2d ed. 1983).[13] It is clear then that appellants must be within the zone of interest of the statutes authorizing OMB Circular A–76, not OMB Circular A–76, itself.

### 1. *Budget and Accounting Act of 1921, as amended.*

■ The first of the two statutes under which the OMB promulgated the Circular is the Budget and Accounting Act of 1921, as amended, 31 U.S.C. § 101 *et seq.* ("1921 Act"). We have found nothing in the 1921

**12.** We emphasize that we are here concerned with Article III standing, not standing before an Article I administrative tribunal, *see, e.g., American Trucking Ass'n v. ICC*, 673 F.2d 82, 85 n. 4. (5th Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983); *Ecee, Inc. v. FERC*, 645 F.2d 339, 349–50 (5th Cir.1981); *Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 605–08 (D.C.Cir.), *cert. denied*, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978), or with a situation in which an agency has granted administrative standing and failed to adhere to that grant. *See Gardner v. FCC*, 530 F.2d 1086, 1090–91 (D.C.Cir.1976). In fact, NFFE and 1,500 of its members asserted administrative standing and appealed the contracting out decision to the Army Review Board. *See* J.A. at 338–39. The Review Board apparently granted standing, as it concluded on the merits that some improprieties required minor changes.

Administrative App.Rev.Bd., *supra*, at para. 4.b. J.A. at 391.

**13.** Professor Davis explains:

On the question whether Congress may determine who has standing, the relevant provision could be Article I, which confers upon Congress the power to create legal rights. *If Congress may confer rights upon a class of persons, Congress may also confer rights to be plaintiffs.*

4 K. DAVIS, *supra*, § 24:5, at 226 (emphasis in original).

We are not faced with a congressional delegation to the Executive to promulgate regulations on standing. Thus we do not address whether Congress may delegate such authority to the Executive.

Act or its legislative history indicating that Congress contemplated in-house federal employees or federal employee labor unions as " '[a particular] class [of plaintiff] to be relied upon to challenge agency disregard of the law.' " *Clarke*, 479 U.S. at 399, 107 S.Ct. at 757 (quoting *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984), other citation omitted, brackets in *Clarke* ).[14] Moreover, we have found sufficient support in the legislative history to conclude that the interests of in-house federal employees are in fact inconsistent with the animating purpose of the 1921 Act and, therefore, they are outside the Act's zone of interest. *Cf. id.*

Generally, in the 1921 Act Congress sought to coordinate budgeting procedures

---

14. Congress has amended the Act thirteen times since its original enactment:

—Budget and Accounting Procedures Act of 1950, Pub.L. No. 784, ch. 946, title I, pt. I, §§ 101, 102, 64 Stat. 832 (1950). *See* H.R. Rep. No. 2556, 81st Cong., 2d Sess. 1, *reprinted in* 1950 U.S. Code Cong. & Admin.News 3707, 3707 (an Act "to modernize and simplify governmental accounting and auditing methods and procedures");

—Act of July 28, 1953, Pub.L. No. 161, ch. 256, 67 Stat. 229 (1953) (to provide for a retirement annuity for the Comptroller General);

—Act of August 1, 1956, Pub.L. No. 863, ch. 814, § 1, 70 Stat. 782 (1956) ("to improve governmental budgeting and accounting methods and procedures, and for other purposes"). *See also* S. Rep. No. 2265, 84th Cong., 2d Sess., 1956 U.S. Code Cong. & Admin.News 3794, 3794;

—Act of August 25, 1958, Pub.L. No. 85–759, § 1, 72 Stat. 852 (1958) (an Act "to provide for improved methods of stating budget estimates and estimates for deficiency and supplemental appropriations"). S. Rep. No. 1866, 85th Cong., 2d Sess. 1, *reprinted in,* 1958 U.S. Code Cong. & Admin.News 3917, 3917;

—Act of July 13, 1959, Pub.L. No. 86–87, 73 Stat. 197 (1959) (an Act providing for annuities to widows and children of Comptrollers General);

—Act of July 26, 1966, Pub.L. No. 89–520, §§ 1, 2, 80 Stat. 329 (1966) (an Act providing for retirement for Comptroller Generals);

—Legislative Reorganization Act of 1970, Pub.L. No. 91–510, title II, § 221, 84 Stat. 1169 (1970). *See* H.R.Rep. No. 1215, 91st Cong., 2d Sess. 1, *reprinted in* 1970 U.S. Code Cong. & Admin.News 4417, 4417–18, 4433–34 (an Act providing, *inter alia,* for improved rules and open proceedings of the Congress and granting the Comptroller General the authority "to review and analyze the results of Government programs and activities");

—Act of March 2, 1974, Pub.L. No. 93–250, § 1, 88 Stat. 11 (1974). *See* H.R. Rep. No. 697, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin.News 2778, 2779 (to provide for the Director and Deputy Director of the Office of Management and Budget to be appointed by the President with the advice and consent of the Senate);

—Congressional Budget and Impoundment Control Act of 1974, Pub.L. No. 93–344, title VI, §§ 601–604, 88 Stat. 323, 324 (1974). *See* S. Conf.Rep. No. 924, 93d Cong., 2d Sess. 1, *reprinted in* 1974 U.S. Code Cong. & Admin.News 3591, 3591 (an Act to assure congressional budget control, provide for the congressional determination of the appropriate level of federal revenues and expenditures, provide a system of impoundment control, establish national budget priorities, and provide for the furnishing of information to Congress by the Executive branch);

—Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. Rev. No. 94–210, title III, § 311, 90 Stat. 60 (1976). *See* S. Rep. No. 499, 94th Cong., 2d Sess. 1, *reprinted in* 1976 U.S. Code Cong. & Admin.News 14, 14–15 (an Act to promote revitalization of the railroad industry in the United States);

—Comptroller General Annuity Adjustment Act of 1978, Pub.L. No. 95–512, §§ 2–4, 92 Stat. 1799, 1800 (1978);

—General Accounting Office Act, Pub.L. No. 96–226, title I, §§ 102–104(b)(1), 94 Stat. 312–315 (1980). *See* S.Rep. No. 570, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S. Code Cong. & Admin.News 732, 732–33 (an Act to strengthen the GAO as the investigative and auditing arm of Congress and to improve budget management and expenditure control relating to the Comptroller General and the Inspector Generals of the Departments of Energy and Health and Human Services). The Act specifically amends the Budget and Accounting Act of 1921 to provide the GAO with sufficiently broad and comprehensive authority to investigate "all matters relating to the receipt and disbursement and application of public funds," *id.* at 2, U.S. Code Cong. at 733; and,

—Federal Managers' Financial Integrity Act of 1982, Pub.L. No. 97–255, § 3, 96 Stat. 815 (1982). *See* H.R. Rep. No. 38, 97th Cong., 1st Sess. 1, *reprinted in* 1982 U.S. Code Cong. & Admin.News 1885, 1885–86 (an Act to improve government internal controls of each executive agency and to require ongoing evaluations and reports under OMB guidelines).

Nothing in these amendments or in their legislative history suggests that the interests of federal employees and federal labor unions are more than marginally related to the congressional purposes behind the 1921 Act. *Cf. Clarke,* 479 U.S. at 399, 107 S.Ct. at 757.

and to increase efficiency in government operations after vast governmental growth during World War I. After the close of the War, the departments and agencies failed to relinquish authority which had enured to them during the War. Congress found departments and agencies duplicating services and decided to centralize the budgeting system under a single office in each of the two political branches.

Before enactment of the 1921 Act, each department or agency developed its own budget and submitted it to Congress, through the Secretary of the Treasury.[15] The President was never directly linked to this process.[16] The congressional committee overseeing that department or agency would authorize and appropriate that budget request. The total United States budget was never forecast; thus it was easy for expenditures to exceed revenues because no single office was monitoring total expenditures. Additionally, each department and agency audited itself with no confirmation by outside auditors.

The 1921 Act established a two-pronged approach to this budgeting (or lack-of-budgeting) crisis. First, Congress created a Bureau of the Budget, the predecessor to the OMB, within, but quasi-independent of, the Department of the Treasury. The Bureau was to consolidate all independent budgets of departments and agencies of the United States government, eliminate duplication of services, and cut funding where services were no longer needed. The national budget of the Bureau, including an estimate of revenues for the next fiscal year, would then become the President's budget which the President submitted as one document to Congress for revision and approval.[17]

The second prong of the 1921 Act was the establishment of the General Accounting Office ("GAO") to represent the legislative interest in the budgeting process. The GAO was to be directed by a Comptroller General and Assistant Comptroller General effectively replacing the Comptroller of the Treasury. The Treasury Comptroller had been seriously hampered in effectively controlling Executive branch spending since he served at the pleasure of the President. The 1921 Act also transferred all the auditors from the various departments and agencies to GAO so that auditors would not be employed by the department they were auditing.

Congress considered these two separate offices, the Bureau and the GAO, one within each political branch, as a functional and valid constitutional "check and balance" over the expenditure of funds. Representative James W. Good of Iowa, the chief sponsor of the 1921 Act, and Chairman of both the House Committee on the Budget and the House Committee on Appropriations, stated:

> We provided for [a] system of *checks and balances* which ought to exist in every well-regulated budget plan. The President originates the budget and he transmits it to Congress. It is up to Congress to determine whether it will accept the estimates, whether it will modify them, reduce them, or enlarge them. Congress must then assume full responsibility for its acts, just as the President assumes responsibility for his when he makes the budget. After the bill has passed, then, under the execution of the law, we provide for that independent establishment in the general accounting office, *an office that will be to the appropriations made by Congress what the Supreme Court is to construction of laws that are enacted by Congress....*

> We create this independent establishment [the GAO], answerable to Congress, an establishment that has clerks and accountants, who will go through every department of the Government. When they find waste and inefficiency, when they find duplication in the service, they will come to the committee of Con-

---

**15.** *See* 59 Cong.Rec. 8626 (1920) (statement of Sen. Smoot) (debate on 1920 version of Act vetoed on other grounds by President Wilson; subject matter of 1921 Act substantially unchanged).

**16.** *Id.*

**17.** *See id.*

gress that has jurisdiction of appropriations and report that fact. That fact will also be communicated to the President of the United States. *With that system of checks and balances* it is believed this great overlapping of activities, this duplication that exists in every department of the Government, will cease, and that the Government of the United States will be placed upon a business basis.... [18]

Throughout debate, Representative Good referred to the GAO as a "semijudicial" office, working directly for Congress to ensure that executive budgets and estimates are properly prepared.[19]

Nothing in the legislative history of the 1921 Act suggests that Congress contemplated the protection of employment of federal employees. Indeed, Representative Good's presentation of the 1921 Act to the 67th Congress suggests a congressional purpose inconsistent with those interests. That is, the Act would require that some federal employees be terminated under the new budgeting process.

> The director of the [Bureau of the Budget] must perform his work without fear or favor. He must do it with a realization that practically every Senator ... will at some time or another be opposed to what he is doing. He must do it with a realization that at some time or another practically every Member of the House

will oppose him.... Many [federal employee] offices must be abolished. *Some of the men who are here performing a public service must go home, and they will have to be sent home;* and when such an officeholder comes from your [congressional] district you will go down and see the [employee's superior] officer in [sic] behalf of the man from your district whom he is discharging, and Senators will go down, and they will make strong pleas showing how this man or that man who is slated to go has been a faithful public servant and why he should be permitted to remain.

> *When it comes to discharging these men who must be discharged,* I say to you it is going to test the backbone in a man who has to do this work; it will try the fiber of the best man that the President can secure.... We ought not to throw upon the Secretary of the Treasury this duty ... [because this] would simply create disturbance with the other members of the Cabinet whose organizations by such act he was attempting to regulate and control.[20]

While Representative Good made this statement during debate on whether the Bureau of the Budget should be under the Department of the Treasury or directly under the Executive Office of the President,[21] his statements illustrate that Congress was

---

**18.** 59 CONG.REC. 7949 (1920) (statement of Rep. Good) (emphasis added) (debate on 1920 version; subject matter of 1921 Act substantially unchanged).

**19.** *See, e.g.,* 59 CONG.REC. 8610 (1920) (debate on 1920 bill); 59 CONG.REC. 8733, 8737 (1920 App.) (extension of remarks). In 61 CONG.REC. 982 (1921) (debate on 1921 Act), Representative Good expressed the view that the 1921 Act

> provides ... for well-regulated *checks and balances in the two departments.* It creates the office of the comptroller general, and he must audit all accounts. *We have created this office and have made it a semijudicial one.* ... [W]hen the committee from the bureau of the budget of the President's staff come and explain the budget, sitting right there, they are brought to face the comptroller general of the United States; and if a representative of the bureau of the budget states something that is not true, if he fails to state the whole truth, the comptroller general sits there with the Committee on Appropriations as an arm of

Congress and can supply the desired information. In this way the facts will come before Congress in a way that we may eliminate duplications wherever we find them, and *where we find there is an excess of employees they can be eliminated,* and the service will not be injured by an injudicious cut in the appropriation.
(Emphasis added.)

**20.** 61 CONG.REC. 981–82 (1921) (statement of Rep. Good) (debate on 1921 Act).

**21.** The House desired an independent Bureau of the Budget whose director reported directly to the President, lest the director be unable to cut the budget of his superior agency, the Department of the Treasury. The Senate, fearing that the Secretary of Treasury would lose control over a substantial area of his responsibility, preferred the Bureau to be an office within Treasury. A modest compromise was arranged where the Secretary of Treasury was a figurehead superior over the director of the Bureau.

aware that some federal employees would lose their jobs after the 1921 Act took effect. He does not hint of any remedy for the severed employees, or suggest that the employees may assert standing upon an act with which their interests are logically inconsistent. Good's statements support the inference to be drawn from the text of the Act. That is, although Congress was well aware that the reformation of the federal budgeting process would result in a loss of federal jobs, it afforded the discharged employees neither protection nor remedy. Thus, the 1921 Act is fundamentally inconsistent with the interests asserted by appellants, who, quite understandably complain that the challenged governmental conduct will cause an adverse impact to in-house employees.

Appellants may have many "interests," but for zone of interest purposes we must look to their particular interests, not to the interests amounting to generalized grievances of all citizens. *See ASARCO, Inc. v. Kadish,* — U.S. —, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989); *City of Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983). The dissent contends that we proceed from an erroneous "fundamental premise that the employees cannot assert an interest in having the government conform to the law in making a contracting out decision." Dissent at 1056. However, as we have previously held, "... to satisfy the zone of interests requirement, appellants must establish that their *particular* interest alleged to have been injured by the [alleged failure of the government to conform to a law] fall within the respective zones of interests intended to be protected or regulated by [that law]." *Haitian Refugee Center v. Gracey,* 809 F.2d 794, 812 (D.C.Cir.1987) (emphasis added).

As we noted in *Haitian Refugee Center,* [i]f any person or organization interested in promoting ... protection of the rights created by a statute ... has an interest that falls within the zone protected or regulated by the statute ..., then the zone-of-interest test is not a test because it excludes nothing. Indeed, such a read-

ing would mean that this court ignores the Supreme Court's decisions that persons who have only a "generalized grievance" about the way in which government operates do not have standing. *Id.* at 813 (citing *Schlesinger v. Reservist Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974)).

Concededly, in *Haitian Refugee Center,* we conducted our zone of interest analysis without the benefit of the *Clarke* decision, but nothing in *Clarke* changes that analysis as it applied in *Haitian Refugee Center* or in the present case. Indeed, in our recent post-*Clarke* zone of interest decision, *Hazardous Waste Treatment Council v. EPA,* 861 F.2d 277 (D.C.Cir.1988) (per curiam) ("*HWTC*"), we expressly reapproved our prior understanding of the generalized grievance concept as taught in *Schlesinger* and *Haitian Refugee Center.* In *HWTC,* we expressly reiterated that neither individuals "with only a 'generalized grievance[ ]'" (citing *Schlesinger*) nor "an organization" formed "to advance [a generalized] grievance" (citing *Haitian Refugee Center*) has a sufficient interest to support standing. *HWTC,* 861 F.2d at 287. Thus, in *HWTC,* although we found that a trade association had standing as an organizational representative of the consumer environmental interest of a member company, we rejected standing to assert claims based solely on the status as representative of competitors of entities allegedly advantaged by the Environmental Protection Agency's failure adequately to perform a statutory duty. We did so, analyzing the standing question in light of *Clarke,* and expressly revivified *Haitian Refugee Center* stating "a rule that gave any such plaintiff standing merely because it happened to be disadvantaged by a particular agency decision would destroy the requirement of prudential standing; any party with constitutional standing could sue." *Id.* at 283. *See also Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 114–17, 107 S.Ct. 484, 491–93, 93 L.Ed.2d 427 (1986) (holding that threatened loss from increased competition did not alone confer

standing on a competitor to bring action under the Clayton Act to enjoin a proposed merger).

In *HWTC*, we recognized that the *Clarke* analysis of the zone of interest test " 'denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' " 861 F.2d at 283 (quoting *Clarke*, 107 S.Ct. at 757.) We thus found that the test now requires "less than a showing of congressional intent to benefit but more than a 'marginal[ ] rela[tionship]' to the statutory purposes." *Id.* (brackets in original).[22]

In the present case, the legislative history of the Budget and Accounting Act of 1921, as amended, leads us to conclude that Congress did not contemplate in-house federal employees and federal employee labor unions as plaintiffs. Congress carefully crafted a two-pronged checks and balances budgeting process to coordinate the United States budgeting process, eliminate duplication of services, and promote efficiency. Congress knew that some federal employees would be adversely affected and, instead of giving these employees some recourse, intentionally removed the director of the Bureau of the Budget from as much external pressure as possible so that he could make the "hard" decision to reduce the employee force where necessary. At most, federal employees' interests are marginally related to this centralized annual budgeting process balanced between the Executive and Legislative branches. *Cf. Clarke*, 479 U.S. at 399, 107 S.Ct. at 757. It is more logical to conclude that federal employees' interests are "inconsistent." *Id.* Appellants alleged particular interest in the instant case is protection of the federal jobs of their members, not govern-

mental efficiency as asserted by them. *See infra.*

If governmental efficiency was appellants' interest, then they would have no greater Article III injury in fact[23] than any taxpayer opposing a government appropriation. *See Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (for a taxpayer to assert standing, the taxpayer must show that the challenged conduct violates a specific constitutional limitation imposed on the taxing and spending clause and does not merely exceed the general delegation of powers to Congress); *see also Bowen v. Kendrick*, —— U.S. ——, 108 S.Ct. 2562, 2579, 101 L.Ed.2d 520 (1988) (referring to *"Flast* and the narrow exception it created to the general rule against taxpayer standing"); Ketler, *supra,* at 115–16 ("[F]ederal employees have no greater legal interest in or standing to assert allegations of government mismanagement [in the contracting out process] than do ordinary taxpayers."); *see generally, District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 3–4 (D.C. Cir.1988).

### 2. *The Office of Federal Procurement Policy Act Amendments of 1979.*

In addition to the 1921 Act, OMB Circular A–76 cites as authority the Office of Federal Procurement Policy Act Amendments of 1979 ("OFPPAA"), as amended, 41 U.S.C. §§ 401–424. *See* OMB Circular A–76 para. 3, J.A. at 12. In 1974, Congress created the Office of Federal Procurement Policy[24] to implement recommendations of the Commission on Government Procurement to establish a central body "to provide overall direction of procurement policy for Federal executive agencies." H.R.REP. No. 178, 96th Cong., 1st Sess. 1, *reprinted in* 1979 U.S.CODE CONG. & ADMIN.NEWS

---

**22.** To be sure, as the dissent points out, we also held in *HWTC* that "[i]n the absence of apparent congressional *intent to benefit,* however, there may still be standing if some factor—some indicator that plaintiff is a peculiarly suitable challenger of administrative neglect—supports an inference that Congress would have intended eligibility." 861 F.2d at 283. We find no such factor in this case. We will discuss this ques-

tion further in relation to alleged standing under the National Defense Authorization Act of 1987, *infra* IIA3.

**23.** *See supra* note 8.

**24.** Office of Federal Procurement Policy Act, Pub.L. No. 93–400, 88 Stat. 796 (1974).

1492, 1492. In OFPPAA, Congress amended and extended the life of this Office.

After a thorough review of the OFPPAA and its legislative history, we have found nothing to suggest a congressional purpose more than marginally related to the interests of federal employees *vis-a-vis* procurement policy. Throughout the legislative history of OFPPAA and its amendments, Congress emphasized economy and efficiency in government operations. Specifically regarding "contracting out," the Senate Committee on Governmental Affairs recognized that there had been a long-standing "executive branch policy of reliance on the private sector" to improve governmental efficiency as expressed in earlier versions of OMB Circular A–76. S.Rep. No. 144, 96th Cong., 1st Sess. 4 (1979), U.S.CODE CONG. & ADMIN.NEWS 1979, p. 1492. Congress specifically validated this Executive branch policy favoring the private sector in its enactment of the OFPPAA:

> The new [contracting out] policy is built on three principles:
>
> 1. Rely on the private sector. The Government's business is not to be in business. If private sources are available, they should be looked to first to provide the commercial or industrial services needed by the Government.
>
> 2. Retain certain governmental functions in-house. Certain functions are inherently governmental in nature being so closely related to the public interest as to demand performance by Federal employees.
>
> 3. Aim for economy. Use cost comparison. When private performance is feasible and no overriding factors require in-house performance, the taxpayer deserves and expects the most economical performance and therefore rigorous comparison of contract cost versus in-house cost should be used

when appropriate to decide how the work will be done.

*Id. See also* H.R. REP. No. 146, 98th Cong., 1st Sess. 8–9 (1983), U.S.CODE CONG. & ADMIN.NEWS 1983, p. 2027 (quoting the above "government[ ] policy on contracting out" and stating that "[t]hese are wise principles, and in their applicability to all agencies they are entirely consistent with the goal that the Federal procurement system be standardized."). The policy endorsed in the Report does not merely favor the private sector; it endorses "reliance" on the private sector. The obvious presumption is that private sector performance is more economical and efficient. Only if the goods or services required are "inherently governmental,"[25] as none of the services in question are, should the procuring agency look away from the private sector. The third principle's call for "rigorous comparison of contract cost versus in-house cost," read in the context of the whole policy, illustrates that Congress wanted in-house costs estimates to be strictly reviewed, so as not to frustrate the first principle's emphasis on the private sector.

Since the legislative history of the OFPPAA endorses the Executive branch policy of reliance on the private sector and the Circular finds authority in the OFPPAA, it is difficult to conclude anything but that the interests of federal employees are inconsistent with the purposes of OFPPAA. As previously discussed, appellants' real interest in this case is the protection of the federal jobs of its members, not efficiency in governmental operations. If appellants' real interest in this case was governmental efficiency, they might very well be within the zone of interest of the purposes of the OFPPAA. But again in the assertion of that interest of efficiency, they have no greater claim to standing than any taxpayers. *See* pp. 1046–1048 *supra.* Their real interest of job protection flies in the face of

---

**25.** "A Governmental function is a function which is so intimately related to the public interest as to mandate performance by Government employees." OMB Circular A–76 para. 6.e., J.A. at 13. These include, *inter alia,* criminal investigations; the management of govern- ment programs; activities related to combat and combat support; the conduct of foreign relations; the regulations of natural resources; the direction of intelligence operations; and the regulation of industry and commerce. *Id.* para. 6.e.1.

a policy that federal departments and agencies, through OMB Circular A–76, should rely on the private sector. Thus appellants' interests are inconsistent with the purposes of the OFPPAA and not within the zone of interest of that Act. *Cf. Clarke,* 479 U.S. at 399, 107 S.Ct. at 757.

Because we hold that appellants' interests are not within the zone of interest of the Budget and Accounting Act of 1921 or the OFPPAA, the statutory authority for OMB Circular A–76, appellants may not assert standing based on those statutes.

### 3. *National Defense Authorization Act of 1987.*

■ Appellants also assert standing under section 1223(b) of the 1987 DoD Authorization Act, 10 U.S.C. § 2304 note. That section requires the Secretary of Defense to "ensure that all costs considered [in a contracting out decision] ... are realistic and fair." *See supra* note 6. Appellants contend that the legislative history of the Act, which prohibits contracting out of federal firefighter and DoD security guard positions, evidences congressional intent to provide employee standing because at least some government jobs are protected. Additionally they point out that advocates for federal employees defeated attempts by private contractors to eliminate built-in "bias" in the contracting out process favoring federal employees, such as the addition of a ten percent conversion differential which must be added to each contractor's bid. We find appellants' arguments unconvincing and, after reviewing the legislative history of section 1223(b), conclude that appellants' interest is inconsistent with the statutory requirement of a "realistic and fair" cost comparison.

From our review of the legislative history, the phrase "realistic and fair" was added to the Authorization Act to protect the private government contractor in the contracting out process against undue built-in "bias" favoring in-house performance of services. In fact, the phrase was added at the behest of government contractors in protest against the ten percent conversion differential. Appellees point to, and we

find convincing, the following explanation of the "realistic and fair" language found in the Senate Report on the Authorization Act.

*Realistic and Fair Cost Comparisons*

DOD handicaps contractors' bidding on services and supplies during cost comparisons against retaining these functions in-house. In addition to the existing 10% [conversion] bias used to date, other handicaps are:

\* Contract Administration Cost—The cost for the government to administer the contract if awarded to a private concern is added to the vendor's bid.

\* Quality and Technical Assurance Cost—Quality and technical supervision and assurance are costs added to the vendor's bid when contracting out work.

\* Excessive liability coverage required and unrealistically low costs for government agencies.

\* Overhead costs computed for the government bid.

Agency cost comparison must be made more equal for determination of contracting out. Some DOD organizations have used these handicaps to their advantage in determining the cost comparison outcome. In addition to opening the door for more competition, the competitions must be conducted on an "apples to apples" basis.

S.Rep. No. 331, 99th Cong., 2d Sess. 278, *reprinted in* 1986 U.S. U.S.Code Cong. & Admin.News 6413, 6472. Thus the legislative history shows that the provision for a "realistic and fair" cost comparison was designed to protect the integrity of the contracting out process by resolving "handicaps" against government contractors—the apparent intended beneficiaries of section 1223(b).

Obedient to the teachings of *Clarke,* we must determine whether the interests of the in-house employees are only marginally related to or inconsistent with the purpose of the statute. *See Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. As discussed above, appellants' real interest in a decision to contract out is the protection of the jobs of their members. Private contractors com-

peting to perform the same services that appellants' members now perform are the central threat to these government union members' jobs. The interests of the in-house federal employees are therefore "antithetical" to the interests of the private contractors because "federal employees present an 'either-or' situation in relation to private" contractors. *American Federation of Government Employees, Local 1668 v. Dunn*, 561 F.2d 1310, 1313 (9th Cir.1977) (federal employees lack standing to contest a contracting out of an Air Force food service facility). Thus appellants' interest is inconsistent with the purpose of the section 1223(b) which provides for contracting out where that is the most cost-efficient alternative. It follows that appellants' interests are not within the zone of interests of the Authorization Act of 1987.

As we noted in footnote 22, *supra*, the dissent correctly points out our holding in *HWTC* that "[i]n the absence of apparent congressional intent to benefit, however, there may still be standing if some factor—some indicator that plaintiff is a peculiarly suitable challenger of administrative neglect—supports an inference that Congress would have intended eligibility." 861 F.2d at 283. In the present case the dissent would find that "factor" in the absence of "another potential plaintiff." Dissent at p. 1058. Assuming—and it is only an assumption [26]—that there is no other potential plaintiff, this is simply not the sort of "factor" necessary to confer standing. Indeed, the Supreme Court teaching is directly to the contrary. "The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservist Comm. to Stop the War*, 418 U.S. at 227,

94 S.Ct. at 2935 (citing *United States v. Richardson*, 418 U.S. at 179, 94 S.Ct. at 2947–48).

In *Schlesinger*, the Supreme Court actually indicated that the absence of other plaintiffs is not a relevant factor, rejecting "the District Court's observation that it was not irrelevant that if respondents could not obtain judicial review of petitioners' action, 'then as a practical matter no one can.'" 418 U.S. at 227, 94 S.Ct. at 2935. The Supreme Court went on to state "[o]ur system of government leaves many crucial decisions to the political processes." *Id.*

Arguably, the discussion in *Schlesinger* occurred in the context of determining Article III rather than zone of interest standing,[27] but logically the same analysis applies in the zone of interest context of the present case. Indeed, we cited and relied on the *Schlesinger* analysis in our zone of interest decision in *Haitian Refugee Center*, 809 F.2d at 813, and *HWTC*, in turn, cites and relies on the relevant portion of *Haitian Refugee Center*, 861 F.2d at 283. The reasoning is equally applicable here. The interests of appellants in lawful and economic conduct of the contracting-out process is no more distinguishable from the interest of the citizenry-at-large than was the interest of the Reservist Committee in *Schlesinger* in preventing members of Congress from holding Reserve military commissions. Insofar as appellants assert an interest different from the citizenry-at-large, that interest—the protection of government employees whose job opportunities would be impaired because of contracting out—is close to the very bureaucratic interest, in expansion of government, that Congress sought to restrain in all of these statutes.[28] Congress has indicated

**26.** The parties did not pursue this line of argument. Therefore, we are unable to hold with any degree of confidence that no such plaintiff lurks in the background, absent either a developed record or argument subjected to the searching light of adverse response.

**27.** However, the context of the *Schlesinger* opinion did not require a clean delineation between the two standing questions. The quoted language occurs in discussion concerning the standing of citizen *qua* citizen to represent an interest characterized by the Court "as 'undiffer-

entiated' from that of all other citizens." 418 U.S. at 217, 94 S.Ct. at 2935. Therefore, the statement is at least arguably applicable in a zone of interest case on its own without further authority.

**28.** Indeed, if the dissent were correct, any single employee of the Defense Department threatened with a job loss or disadvantage by reason of departmental contracting out would have standing to sue.

no intention to rely on the bureaucracy as a plaintiff class, and, indeed, all evidence is to the contrary. The bureaucratic interest functions internally, as it did in this case in the extensive review conducted by the Evaluation Board, the Administrative Appeals Review Board, and the General Accounting Office. *See supra*, pp. 1040–41.

In this connection, we note that the dissent turns the "intent to rely" analysis on its head, stating that "the federal employees, and therefore the Union plaintiff here, do have standing unless the statutes or their legislative histories reveal a congressional intent to preclude reliance on this particular class of plaintiffs." Dissent at 1058. But Supreme Court precedent requires an affirmative not a negative test: "the essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" *Clarke*, 479 U.S. at 399, 107 S.Ct. at 757 (quoting *Block*, 467 U.S. at 347, 104 S.Ct. at 2454) (other citation omitted). Nothing in *Clarke* or any other authority cited by the dissent or the parties suggests that the assumed unavailability of other plaintiffs is any more relevant to the intent of Congress in the

present context than it was to the determination of the lack of "citizen standing" in *Schlesinger*.

**B. *Disappointed Bidder Standing*.**

■ Lastly, appellants assert standing equivalent to that of a "disappointed bidder" in a government contract solicitation and award. Since *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), this Circuit has recognized that a disappointed bidder in a government contract award has standing under section 702 of the APA, 5 U.S.C. § 702, to act as a " 'private attorney general,'" in order to "prevent[ ] the granting of [a] contract[ ] through arbitrary or capricious action" amounting to "illegal [agency] activity." 424 F.2d at 864. *See also National Maritime Union of America*, 824 F.2d at 1236–38; *Orange Park Florida T.V., Inc. v. FCC*, 811 F.2d 664, 671–72 (D.C.Cir.1987); *Delta Data Systems Corp. v. Webster*, 744 F.2d 197 (D.C.Cir.1984). The disappointed bidder doctrine has since been recognized by most circuits [29] and Congress affirmatively recognized the doctrine in the legislative history of the Federal Courts Improvement Act of 1982.[30]

29. *See Choctaw Mfg. v. United States*, 761 F.2d 609 (11th Cir.1985); *In re Smith & Wesson*, 757 F.2d 431 (1st Cir.1985); *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1573–75 (Fed.Cir. 1983); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713 (2d Cir.1983); *Airco, Inc. v. Energy Research & Development Admin.*, 528 F.2d 1294, 1296 (7th Cir.1975) (per curiam); *Armstrong and Armstrong, Inc. v. United States*, 514 F.2d 402 (9th Cir.1975); *Hayes Int'l Corp. v. McLucas*, 509 F.2d 247 (5th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); *Merriam v. Kunzig*, 476 F.2d 1233, 1241–43 (3d Cir.), *cert. denied*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973); *Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233, 1236–38 (1970); *but see People's Gas, Light & Coke Co. v. United States Postal Service*, 658 F.2d 1182, 1193 n. 7 (7th Cir.1981) (questioning disappointed bidder standing in light of the zone of interest test); *Cincinnati Elec. Corp. v. Kleppe*, 509 F.2d 1080, 1086 (6th Cir.1975) (contending that the *Clarke*-rejected requirement of congressional intent to benefit, *see Clarke*, 479 U.S. at 399–400 & n. 15, 107 S.Ct. at 757–58 & n. 15, is necessary for a party to assert APA standing in the "relevant statute").

30. Pub.L. No. 97–164, 96 Stat. 25 (1982) ("FCIA"). FCIA established the Claims Court which assumed the jurisdiction of the Court of Claims. Congress indicated an intent to retain the disappointed bidder or *Scanwell* doctrine. The Report of the House Committee on the Judiciary states:

It is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the Provisions of the Administrative Procedure Act in instances of illegal agency action. *See, e.g., Scanwell Laboratories, Inc. v. Shaffer* .... Therefore, ... the Committee is satisfied by clothing the Claims Court with enlarged equitable powers not to the exclusion of the district courts.

H.R. Rep. No. 312, 97th Cong., 1st Sess. 43 (1981). The Report of the Senate Committee on the Judiciary agreed:

By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area. Specifically the Scanwell doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970 is left in tact [sic].

We note that courts have applied disappointed bidder status to meet both Article III injury requirements[31] and zone of interest requirements.[32] This Circuit has considered "disappointed bidder" status as establishing the bidder's right to step into the shoes of the public and assert the public interest. In *Scanwell Laboratories*, Judge Tamm wrote for the Court:

> [T]here is no right in [the disappointed bidder] to have the contract awarded to it in the event the district court finds illegality in the award of the contract.... Thus the essential thrust of [the disappointed bidder's] claim on the merits is to satisfy the public interest in having agencies follow the regulations which control government contracting. The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a "private attorney general."

*Scanwell Laboratories*, 424 F.2d at 864. More recently, now-Justice Scalia, while a member of our Court, restated this emphasis on the public interest: the "main objective" of the disappointed bidder doctrine is "to assure that the government obtains the most advantageous contract[ ] by complying with the procedures which Congress and applicable regulations have provided." *Delta Data Systems*, 744 F.2d at 206. *See also Orange Park Florida T.V.*, 811 F.2d at 672 ("[A] wrongful award of a government contract constitutes a discrete economic injury to unsuccessful bidders, who [then] have an incentive to vindicate the public interest as well as their own by insisting on the integrity of the procurement process.") (citations omitted).

While Judge Tamm's original language in *Scanwell Laboratories* is broadly phrased, apparently to include as a dis-

appointed bidder anyone "who suffers injury as a result of the illegal activity," 424 F.2d at 864, a decade later he made it clear that disappointed bidder status is unavailable to those who "cannot claim the special relationship found ... to exist between a bidder and the government; unlike the bidder in the context of a solicitation, they have not 'placed in the hands of the representatives of the Government the power to bind [it] to a contract.'" *Control Data Corp. v. Baldrige*, 655 F.2d at 293 (quoting *Merriam v. Kunzig*, 476 F.2d at 1242 n. 7. The government is obligated to provide the bidder under this special relationship with a "legally valid" and "fair procurement," *National Maritime*, 824 F.2d at 1237–38, which presumably fosters competition amongst contractors thereby benefiting the public interest. *See Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 842 (D.C.Cir.1982). Not every bidder in a solicitation may assert disappointed bidder standing, otherwise nuisance suits could handicap the procurement system. Rather, standing is conferred only to those bidders who are "'within the zone of active consideration' for the bid's award." *National Maritime*, 824 F.2d at 1237–38 n. 12 (quoting *CACI, Inc.–Federal v. United States*, 719 F.2d at 1574–75, other citation omitted). *See also Morgan Business Assocs., Inc. v. United States*, 223 Ct.Cl. 325, 619 F.2d 892, 896 (1980). Moreover, the special relationship ends once the solicitation and award process is complete and the bidder has received his lawful and fair procurement. *See Gull Airborne Instruments*, 694 F.2d at 842–43 (disappointed bidder standing does not provide right to challenge contract administration).

Neither appellants nor their members bid on a contract and, thus, have *never* placed themselves in the special relationship by which the government can bind them to the bid. Moreover, with no bid on a solicitation, it is impossible for them to be within

---

S.Rep. No. 275, 97th Cong., 2d Sess. 23, *reprinted in* 1982 U.S. Code Cong. & Admin.News 33.

**31.** *See, e.g., National Maritime*, 824 F.2d at 1237 ("Most of the cases ... invoke [the disappointed bidder's] right as a means to resolve the zone-of-

interest question ... [b]ut we believe that [it] ... is essential to article III standing in a procurement challenge.").

**32.** *See, e.g., B.K. Instrument*, 715 F.2d at 719–20; *Control Data*, 655 F.2d at 293.

the zone of active consideration. Thus, we hold that appellants do not have disappointed bidder standing to contest the contracting out decision made by Fort Sill. As we stated in *National Maritime,* regarding an assertion of disappointed bidder standing by a union representing employees of an unsuccessful bidder, "the right is [the contractor's], not [the union's]." 824 F.2d at 1238.

### III. CONCLUSION

For the above stated reasons, we find that appellants lacked standing to contest the Army's contracting out decision. We therefore find it unnecessary to determine whether administrative decisions to contract out are subject to judicial review.

*Affirmed.*

MIKVA, Circuit Judge, dissenting:

Today this court finds that government employees who stand to lose their jobs as a result of what we must assume—at this stage—to be illegal contracting out decisions are not entitled to raise their claim in court. This is not the first time that our circuit has attempted to restrict the standing of those who may sue under § 702 of the Administrative Procedure Act ("APA"). In a series of cases a few years ago, including *Control Data Corp. v. Baldrige,* 655 F.2d 283 (D.C.Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981) and *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951 (D.C.Cir.1982), this circuit created a demanding test for standing under § 702 using the same zone of interest rubric the majority employs again here. The test was far more difficult to meet than any promulgated by the Supreme Court itself and, not surprisingly, the Court specifically disapproved it two terms ago in *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 400 n. 15, 107 S.Ct. 750, 757 n. 15, 93 L.Ed.2d 757 (1987). This lesson is lost on the majority today, who pursue the same goal by only slightly different means, despite the Supreme Court's clear signals that the goal itself is inappropriate.

Originally, the zone of interest test for § 702 claims was adopted, in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970), to enlarge, not restrict, the class entitled to protest administrative action. *See American Friends Service Committee v. Webster,* 720 F.2d 29, 49 (D.C.Cir.1983). The Supreme Court has repeated loudly and clearly that courts are to welcome those pursuing grievances under the APA. In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), the Court said that "the Administrative Procedure Act's generous review provisions must be given a hospitable interpretation" and that "only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review" (internal quotations deleted). In *Barlow v. Collins,* 397 U.S. 159, 166–67, 90 S.Ct. 832, 837–38, 25 L.Ed.2d 192 (1970), the companion case to *Data Processing,* the Court cautioned that "preclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred" and that "judicial review * * * will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." In its most recent opinion on the subject, the Court reiterated that while the zone of interest test is a gloss on § 702 and provides some limit to access, it "is not meant to be especially demanding," and there need only be "a plausible relationship" between the interest plaintiff asserts and the policies underlying the relevant statutory framework. *Clarke,* 479 U.S. at 396, 399, 403, 107 S.Ct. at 756, 757, 759.

In the 19 years since the Court announced the zone of interest test for § 702 claims, it has yet to find any party before it outside that zone. It has only once found that plaintiffs, though within the zone of interests, were statutorily precluded from bringing suit, in *Block v. Community Nutrition Institute,* 467 U.S. 340, 348, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984). *See also Clarke,* 479 U.S. at 400, 107 S.Ct. at 757 (interpreting *Block* as finding preclusion). In *Block,* the Court found that

granting standing for the plaintiffs would have permitted an end run around a carefully constructed administrative review procedure, enacted by Congress to resolve the same kind of complaint as plaintiffs brought, with only limited resort to the court system.

Nonetheless, the majority today has found a way to deny standing under § 702 to the plaintiff here. That the National Federation of Federal Employees ("NFFE") satisfies Article III's standing requirements is scarcely in doubt. Its members have suffered substantial injury in fact. The Fort Sill contracting out decision led to the abolition of 401 positions. More than 200 employees were scheduled for discharge, 125 others for demotion. Nor is there a difficult question as to causality or redressability. Plaintiff's claim is that the Army artificially inflated the cost of the most efficient in-house performance of the Fort Sill functions and artificially deflated the cost of converting to using a private contractor, with the result that letting the contract to Northrup only appeared to be the least expensive means of getting the job done when actually in-house services were least expensive. If plaintiff is correct, the distortions certainly are causally related to the Army's decision to hire Northrup. If plaintiff could pursue this matter and prove all its claims, the army decision *sub judice* would have to be vacated and the Army would be required to choose again the least expensive option, which would be shown to be the in-house services.

The majority neither acknowledges nor refutes this. Instead, it holds that the union and its members are not within the zone of interests of the Budget and Accounting Act of 1921 ("1921 Budget Act"), the Office of Federal Procurement Policy Act Amendments of 1979 ("OFPPAA"), or the 1987 Department of Defense Authorization Act ("1987 Authorization Act"). Its reasoning is as follows: (1) the federal employees' real interest is in keeping their jobs; (2) the statutes at issue do not indicate any congressional interest in maintaining or enlarging federal employment— they, in fact, show an interest in reducing employment when it can save money without sacrificing governmental needs; (3) the only way the employees can assert an interest in enforcing the rules aimed at increasing government economy and efficiency is as taxpayers, and under *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), no taxpayer standing is available to challenge these government actions.

The majority's claim—that NFFE's members are really only interested in keeping their jobs and that this interest is either marginally related to or inconsistent with Congress' purposes and that the members cannot assert an interest in enforcing the rules applying to contracting out decisions except as taxpayers—is wholly at odds with the Supreme Court's reasoning and decisions in its APA zone of interest cases.

The data processing companies, in the Court's first zone of interest case, were really only interested in keeping their profits, an interest certainly marginally related to Congress' purposes in enacting the banking laws, but the Court held that they had standing to enforce the banking laws' rules restricting bank activities. *Data Processing*, 397 U.S. at 156–58, 90 S.Ct. at 831–32. Likewise, the travel agents in *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); the investment companies in *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (*"ICI"*); and the discount brokers in *Clarke*, all interested solely in their bottom line, were permitted to assert the public interest in restricting bank activities.

In each of these cases, the Court understood plaintiffs' interest as a desire to hold on to their profits. *See Data Processing*, 397 U.S. at 152, 90 S.Ct. at 829; *Arnold Tours*, 400 U.S. at 45, 91 S.Ct. at 158; *ICI*, 401 U.S. at 620, 91 S.Ct. at 1093; *Clarke*, 479 U.S. at 403, 107 S.Ct. at 759. In each of these cases, the Court neither found nor suggested that such an interest was to be found among Congress' purposes in enacting the statute that the plaintiffs sued under. In *Data Processing*, the Court specifically distinguished *Flast* as irrelevant. *Flast*, it said, was a taxpayer suit, whereas

this was a competitor's suit and the two "do not necessarily track one another." *Data Processing*, 397 U.S. at 152, 90 S.Ct. at 829. Thus, the Court has repeatedly granted standing to plaintiffs whose actual motivation is marginally related to Congress' purposes, but whose asserted interest is consistent with them. *See Data Processing*, 397 U.S. at 156–58, 90 S.Ct. at 831–32; *Arnold Tours*, 400 U.S. at 46–47, 91 S.Ct. at 159; *ICI*, 401 U.S. at 620–21, 91 S.Ct. at 1093–94; *Clarke*, 479 U.S. at 403, 107 S.Ct. at 759.

In the Supreme Court's most recent zone of interest case, *Clarke*, the Court made explicit what had been implicit in both *Data Processing* and *ICI*. "The Court's concern," it said of the *Data Processing* decision, "was to ensure that the data processors' association would be a reliable private attorney general to litigate the issues of the public interest \* \* \*. [Although expressed in relation to Article III requirements,] the concern that the plaintiff be 'reliable' carries over to the 'zone of interest' inquiry, which seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Clarke*, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12 (some internal quotations deleted). *Clarke* explains that the Court in *ICI* did not take issue with the dissent's assertion that "there was no evidence that Congress had intended to benefit the plaintiff's class when it limited the activities permitted national banks." *Clarke*, 479 U.S. at 398, 107 S.Ct. at 757. The Court explained that "it was enough to provide standing that Congress, for its own reasons, primarily its concern for the soundness of the banking system, had forbidden banks to compete with plaintiffs by entering the investment company business." *Id.*

The majority's argument is essentially that the court should look behind the plaintiff's asserted interest and consider its subjective interest. Under the majority's logic, a criminal defendant, in whose house or on whose person contraband is found, would not have standing to assert a fourth amendment claim because his "real" interest is in being free of all searches and seizures, not just unreasonable ones. That is not the law of standing and never has been.

Not surprisingly, the majority cites very little authority to support its fundamental premise that the employees cannot assert an interest in having the government conform to the law in making a contracting out decision. That which it does cite is either inapposite or without legal force. The two cases cited for the proposition that "for zone of interest purposes we must look to [plaintiffs'] personal interests, not to the interests amounting to generalized grievances of all citizens," *see* Majority Opinion ("Maj. Op.") at 1048 n. 22, are not even zone of interest cases. Nor are they opinions in which the court muses on the subject of how to approach zone of interest questions. They do not, in short, support in any way the proposition for which they are cited.

The first case, *ASARCO, Inc. v. Kadish*, — U.S. ——, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989), does contain a standing question: whether the state taxpayers or the teachers' association who brought the suit meet Article III's standing requirements. But Article III standing is not the subject at issue in the majority's opinion. The majority expressly decline to address it. Maj. Op. at 1041 n. 8. Similarly, *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), does not involve zone of interest questions, only an Article III one. The majority's further attempts to support its flawed premise include only a law review, and a handful of cases or parts of cases involving defects in Article III standing that do not address the question here: whether those claiming to be aggrieved under the APA are permitted to vindicate the public interest as private attorneys general. *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C.Cir.1987), involves an Article III question, causality, and a prudential third-party standing question. *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), is a taxpayer standing case. *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), includes both citizen

and taxpayer standing. None involve a zone of interest analysis. The majority asserts without explanation that assessing zone of interest standing follows "logically the same analysis" as determining Article III standing. *See* Maj. Op. at 1051.

The questions, however, are altogether different. To have standing under Article III means to have "a personal stake in the outcome." *See Richardson*, 418 U.S. at 179, 94 S.Ct. at 2948. It means that the plaintiff's interest must be sufficiently concrete that he will be a determined, practical advocate. Thus, the Court bars a person with only a "generalized grievance," such as the plaintiff claiming citizen standing in *Schlesinger* or general taxpayer standing in *Richardson*. But, the federal employees suing here have as personal and concrete a stake as the framers of Article III could have had in mind; they have lost their jobs. To be arguably within the zone of interests of a statute, on the other hand, means that Congress plausibly expected someone such as the plaintiffs to enforce its expressed statutory intentions—a wholly separate inquiry. When the Supreme Court in *Richardson* and *Schlesinger* says that it is irrelevant in determining standing that no one else would have standing either to bring the claim, it is saying that if unlawful behavior does not actually cause anyone any tangible harm, then Congress will have to be the overseer. *See Richardson*, 418 U.S. at 179, 94 S.Ct. at 2947–48. When the majority says that it is irrelevant to the zone of interest inquiry that no one else could have standing to bring a claim either, it is saying that Congress must be understood to be indifferent to whether its statutes are being complied with.

The zone of interest inquiry is at base an inquiry into Congress' intent. *See Block*, 467 U.S. at 347, 104 S.Ct. at 2454–55. Standing is permitted, as the majority explains at xx, to those whom Congress intended to be relied on to challenge agency disregard of the law. *Clarke*, 479 U.S. at 399, 107 S.Ct. at 757. But how that intent is to be determined is explained by the Supreme Court in the same paragraph: there is a presumption of judicial review of agency action which is overcome when

there is a fairly discernible congressional intent to preclude it. *Id.* Thus, it is the majority who have stood the "intent to rely" test on its head. *See* Maj. Op. at 1052.

This circuit has recently had occasion to consider the precise question of how the Supreme Court's zone of interest decisions are to be parsed as they apply to plaintiffs whom Congress was not affirmatively trying to protect. In *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277 (D.C.Cir.1988) (*per curiam*), *cert. denied*, — U.S. ——, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989) ("*HWTC*"), an association of hazardous waste control companies challenged the agency's rules as too lax. The companies' competitive injuries were that lax rules meant lower profits for them, as there would be fewer occasions when other companies would be required to hire their services. There was no claim that Congress enacted the environmental law to increase the companies' profits.

This court analyzed the Supreme Court's zone of interest decisions and concluded that: "In the absence of apparent congressional intent to benefit, however, there may still be standing if some factor—some indicator that the plaintiff is a peculiarly suitable challenger of administrative neglect—supports an inference that Congress would have intended eligibility." *Id.* 861 F.2d at 283. This court read *Clarke*, *ICI*, and *Data Processing* as examples of this latter standing. *Id.* 861 F.2d at 284. It explained:

> The [Supreme] Court may have inferred congressional approval of such challengers on the view that those whom Congress explicitly sought to benefit would make relatively unsuitable plaintiffs. For example, it is hard to picture a person or firm that could assert injury in the form of "the dangers of possible loss of public confidence in banks and the danger to the economy as a whole of speculation fueled by bank loans for investment purposes[.]"

*HWTC*, 861 F.2d at 284 (quoting *Clarke*, 479 U.S. at 398 n. 13, 107 S.Ct. at 756 n. 13). In contrast, competitors suffer

"sharp, clear losses" when banks invade forbidden territory. *Id.* 861 F.2d at 284. This court then applied this analysis to HWTC. Because it specifically found that there were other identifiable potential plaintiffs, intended to be protected by Congress, who were "highly suitable champions of enforcement," this court concluded that there was no evidence of congressional intent to rely on HWTC and its members. *Id.*

*HWTC's* reading of the Supreme Court's zone of interest pronouncements is not only sensible and supportable, it is this circuit's own recent precedent. As such, it should be the approach applied to the case at bar by the majority. It would, however, yield the opposite result. There is no evidence that Congress intended to benefit federal employees when it passed at least two of the three statutes at issue, and ambiguous evidence as to the third. Thus the question, according to *HWTC,* is whether there is some factor—such as that federal employees are peculiarly suitable challengers of administrative misfeasance—that would support an inference that Congress would have intended that they have standing. That factor is present here.

The federal employees suffer "sharp, clear losses" whenever over-estimates of the cost of in-house performance of a government function or under-estimates of the cost of converting to private contractors results in selection of a more expensive choice to do the work than is available in-house. Though Congress has, in each of the statutes under which plaintiff claims standing, expressed a clear purpose favoring economy in the conduct of governmental affairs, no other parties are motivated to enforce any rules preventing this particular type of waste. The winning bidder can hardly be expected to challenge cost calculations when it has won. The losing bidders might sue if the winning bidder was given some advantage over them. They might also sue if the government *under*-estimated the cost of in-house performance or *over*-estimated the cost of converting to private contractors, but they have nothing to gain from errors in the opposite direction.

The only people who suffer loss if the government commits the type of errors alleged in this case, besides the employees, are taxpayers. Notwithstanding the majority's caution, it is not difficult to come to this conclusion. The only people affected when contracting out decisions are made are the federal employees, the agency, the winning bidder, private companies who either lost or would have competed but for some failure, and the people who foot the bill—the taxpayers. The agency cannot sue itself. All of the private companies—whether the winning bidder, the losing bidders, or potential competitors—are placed in an advantageous position when the government overestimates the in-house costs and therefore would not be able to allege the harm necessary to meet Article III standing requirements. Lastly, no taxpayer, as the majority has persuasively explained, would meet the personal stake requirement of Article III in order to sue on such a claim. The displaced federal employees, on the other hand, have been harmed, and, unlike *HWTC,* there is no one else eligible and motivated to enforce Congress' purpose.

Therefore, applying the law of standing consistently with Supreme Court and our own precedent, the federal employees, and therefore the union plaintiff here, do have standing unless the statutes or their legislative histories reveal a congressional intent to preclude reliance on this particular class of plaintiffs. *See Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. As *HWTC* indicates, the availability of another potential plaintiff whom Congress affirmatively sought to protect may defeat standing. In the only Supreme Court case—as well as in every post-*Clarke* D.C. Circuit case—rejecting APA standing, another potential plaintiff was found to be available. In *Block,* consumers challenged orders setting milk market orders (minimum prices paid to producers) on the ground that the prices were too high. The Court found that milk handlers were equally motivated to challenge high prices, and that Congress had contemplated that they would do so. *Block,* 467 U.S. at 346, 104 S.Ct. at 2454.

In *HWTC*, this court found that the consumers of environmental purity were "highly suitable champions of enforcement." *HWTC*, 861 F.2d at 284. In *Water Transport Association v. ICC*, 819 F.2d 1189 (D.C.Cir.1987), this court, in denying standing to water carriers, found that shippers and ports had standing to bring the same claim and were contemplated by Congress as the parties to be relied on in enforcing the provisions of the statute. *Id.* at 1190 n. 6, 1192, 1195 n. 48, 1197.

While the existence of an alternative plaintiff, affirmatively contemplated by Congress, may not always be sufficient ground to deny standing, *see International Ladies' Garment Union v. Donovan*, 722 F.2d 795 (D.C.Cir.1983), neither the Supreme Court nor this court (since *Clarke*) has denied APA standing when, as here, no alternative plaintiff can be found. In *Block*, the Supreme Court also emphasized another factor. It found that Congress had provided that the handlers were to first subject a price challenge to administrative review before suing in court and had prohibited injunctions in such suits. *Block*, 467 U.S. at 347–48, 104 S.Ct. at 2454–55. The Court explained that permitting consumers to sue directly would permit handlers, either as consumers or by joining forces, to manage an end run around both restrictions and that this showed that Congress did not intend consumers to have standing. *Id.* at 348, 104 S.Ct. at 2455. NFFE's standing in the case *sub judice* would not implicate this concern either; none of the three statutes under which plaintiff claims standing include any limitations on judicial review that plaintiff's standing would circumvent.

The 1921 Budget Act was enacted to centralize the budget process and make it more economical. This is emphasized repeatedly in its legislative history. For example, its chief sponsor, Rep. James W. Good, said in describing the evil the law was intended to remedy: "We have been talking about economy in Government affairs, and at the same time have been practicing extravagance. * * * It will be necessary to adopt a system of economy and efficiency in every department, establishment, and bureau in order that the Government of the United States may obtain what it has never obtained before in all its history, and that is a dollar's worth of service, if possible, for every dollar expended." 61 Cong.Rec. 980 (1921). Thus, an action brought by NFFE to assure that the Army chooses to obtain needed services by the least expensive means is wholly consistent with Congress' purposes.

The majority contends that there is no evidence that Congress actually contemplated the "protection of employment of federal employees." Maj. Op. at 1046. This, however, has no bearing on the question, as the Supreme Court has specifically noted that such affirmative evidence is unnecessary for a plaintiff to come within the zone of interests of a statute. *Clarke*, 479 U.S. at 399–400, 107 S.Ct. at 757–58. The majority next points to two statements in the legislative history showing that Congress contemplated that some federal workers would be discharged as a result of efforts to eliminate duplication and waste, and that Congress would actively seek to eliminate "excess" employees when service would not be injured thereby. Maj. Op. at 1046 n. 19, 1046–47. Again, this has no bearing on the question of standing. Congress' interest in streamlining government and firing *unneeded* workers, is scarcely inconsistent with NFFE's suing to force the Army to choose the most cost-effective method of securing needed services. And there is no evidence in the legislative history of hostility to federal employees *per se* or to continued federal employment—as long as it is economical.

OFPPAA, like the 1921 Budget Act, was aimed at increasing the economy and efficiency of the federal government. The majority denies standing on the ground that the statute and its legislative history do not contain evidence that NFFE's interest is more than marginally related to Congress' purposes—again, implicitly applying the test disapproved in *Clarke*. Maj. Op. at 1048. What makes NFFE's interest more than marginally related to Congress' purposes in enacting OFPPAA is not any explicit language in the statute or legislative

history about federal employees; rather it is NFFE's unique ability to enforce Congress' clearly expressed interest in the government obtaining services at the lowest cost. *See HWTC*, 861 F.2d at 283.

The majority also denies standing under OFPPAA on the basis of a Senate Report which it says shows that Congress favored the private sector over federal employees, presumed "that private sector performance is more economical and efficient" and called for strict review of in-house costs. Maj. Op. at 1049. The majority, however, is reading more into the report than is there. That report does indeed say that the OMB's contracting out policy is based on three principles: reliance on the private sector, retention of functions in-house which are "inherently governmental in nature," and choosing the most economical approach after rigorous cost comparisons of contract versus in-house costs. S.Rep. No. 144, 96th Cong., 1st Sess. 4 (1979).

Nothing in the report, nor in the amendment Congress passed, however, evinces any interest in changing the contracting out system from one of absolute neutrality between federal employees and private contractors where the lowest bid wins, *see* OMB Circular A-76, to one which "favors" the private sector or presumes that the private sector is more economical and efficient. If Congress wanted to establish a presumption that the private sector is always more economical than government, why did it continue to permit time-consuming, lengthy cost comparisons before each and every contracting out decision? If Congress favored the private sector, why did it not require the government to use private enterprise for every function which is not "inherently governmental in nature"? The reason Congress acquiesced in OMB's provider-neutral decision-making strategy is that its interest was, first and last, in saving money—an interest which NFFE's suit is not only consistent with but promotes. Finally, neither the Senate report nor OFPPAA say anything at all about review of estimated costs, in-house or otherwise.

The 1987 Department of Defense Authorization Act was, like most authorization statutes, aimed at many things. Two sections are pertinent to this inquiry, § 1223 and § 1224. The majority's sole focus is on § 1223(b), the 1987 Authorization Act provision under which NFFE is suing. This is inconsistent with Supreme Court precedent and results in a distorted view of Congress' intention toward contracting out. In *Data Processing*, the Court looked not only to the provision under which plaintiffs sued but also to a related although wholly different act, passed decades later, to find that plaintiffs satisfied the zone of interest test. *See Data Processing*, 397 U.S. at 155–56, 90 S.Ct. at 830–31. The Court again confirmed the appropriateness of interpreting the phrase "a relevant statute" in § 702 broadly, for the purposes of the zone of interest test, in its most recent decision on the issue. *See Clarke*, 479 U.S. at 396–97, 107 S.Ct. at 756.

Looking no further than the 1987 Authorization Act itself, but at the immediately surrounding provisions as well as the one plaintiff sues under, it is clear that Congress' stance throughout was neither consistently pro-federal employee nor pro-private contractor. The contracting out provisions were enacted under a section entitled "Economy and Efficiency." Pub.L. 99–661, 100 Stat. 3976. Congress' interest was in an economically run defense program and its statutory choices manifest a deliberate attempt to construct a purposeful balance among the interests involved. *Cf. Wilderness Society v. Griles*, 824 F.2d 4, 18 n. 11 (D.C.Cir.1987) (finding plaintiff within zone of interests of federal statutes because they were attempting to enforce the "purposeful balance" Congress had struck).

The legislative history cited by the majority is the Senate Report explaining the Senate's version of § 1223(b). Maj. Op. at 1050. The Senate committee, as the majority explains, called for "realistic and fair" cost comparisons because it believed that the Department of Defense ("DOD") was putting its thumb on the scale to maintain defense functions in-house. The Senate's version also made no mention of the ten percent differential that, under OMB rules,

was added to any private contractor's bid to cover various hidden costs. In addition, the Senate's version prohibited conversion of any commercial or industrial activity performed by a private contractor to performance in-house, excepting emergency conditions, unless the Secretary of Defense informed Congress first and provided it with a detailed five-year cost projection of the two alternatives.

Thus, the majority's detection of a pro-private contractor bias in the Senate committee's report is not without foundation, although even the Senate committee continued to call for DOD to choose the lowest cost alternative rather than insisting on private contractors wherever national security permitted. *See* S.Rep. 331, 99th Cong., 2d Sess. 277, *reprinted in* 1986 U.S. Code Cong. & Admin.News 6413, 6472. However, the bill described by that Senate report did not pass in its entirety, and several of the changes worked in conference are instructive.

For example, § 1223(a), as enacted, requires the Secretary of Defense to procure supplies and services from the private sector *"if such a source can provide such supply or service to the Department at a cost that is lower (after including any cost differential required by law, executive order, or regulation) than the cost at which the Department can provide the same supply or service."* 1987 Authorization Act, Pub.L. 99–661, 100 Stat. 3977 (emphasis added). This language, in particular the insistence that prescribed cost differentials be added to private contractor bids before comparing them with in-house cost estimates, was added in conference. *See* H.R.Conf.Rep. 1001, 99th Cong., 2d Sess. 526, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6413, 6585. It replaced § 1233 of the 1986 law that simply required the Secretary to ensure that private contractors are used when they would be cost effective and in the best interests of national security. *See id.;* Pub.L. 99–145, 99 Stat. 734. It may be debatable whether this change manifests an intention to protect federal employees, as appellant argues, but it certainly shows that Congress had no preference for private con-

tractors over federal employees, if the employees were the cheapest alternative. And it shows that Congress wanted to make sure that the scales could be tipped toward employees if this would better reflect real costs (or a policy decision).

The Senate's tough reconversion was also changed in conference. Instead of being prohibited from converting functions back in-house unless he submitted a five-year projected comparative cost study, the Secretary was left free to return functions from private contractor to government. Congress decided to require the Secretary only to maintain data comparing the projected cost of continuing the contract to the actual cost of in-house performance and to submit such data to Congress after the first and second six months after the change. *See* H.R.Conf.Rep. 1001, 99th Cong., 2d Sess. 527, *reprinted in* 1986 U.S. Code Cong. & Admin.News 6413, 6586; Pub.L. 99–661, § 1224, 100 Stat. 3977–78. Again, while the initial Senate bill might have been interpreted as demonstrating a pro-private contractor bias, the statute as enacted shows that any such bias was eliminated before passage.

An earlier statute, in effect when the Fort Sill decision was made, sheds further light on Congress' purposes with regard to contracting out. It provided:

(a) No commercial or industrial type function of the Department of Defense that on October 1, 1980, is being performed by Department of Defense civilian employees may be converted to performance by a private contractor—

(1) to circumvent any civilian personnel ceiling; *or*

(2) unless the Secretary of Defense provides to the Congress in a timely manner—

(A) notification of any decision to study such commercial or industrial type function for possible performance by a private contractor;

(B) a detailed summary of a *comparison of the cost of performance of such function by the Department of Defense civilian employees and by private con-*

tractor which demonstrates that the performance of such function by a private contractor will result in a cost savings to the Government over the life of the contract and a certification that the entire cost comparison is available;

(C) a certification that the Government calculation for the cost of performance of such function by Department of Defense civilian employees is based on an estimate of the most efficient and cost effective organization for performance of such function by Department of Defense civilian employees; and

(D) a report, to be submitted with the certification required by subparagraph (C), showing—

(i) the potential economic effect on employees affected, and the potential economic effect on the local community and Federal Government if more than 50 employees are involved, of contracting for performance of such function; * * *

Pub.L. 96–342, tit. V, § 502, 94 Stat. 1086 (1980), as amended by Pub.L. 97–252, tit. XI, § 1112(a) (1982), 96 Stat. 747, reprinted at 10 U.S.C. § 2304 note (emphasis added).

Understood in context, Congress' passage of § 1223(b) indicates that the words "realistic and fair" were meant literally. The Senate report makes it clear that the committee was concerned with abuses that favored in-house performance. But not only is there no indication that the Senate would have been indifferent to DOD abuses that favored private contractors, there is every indication—in both the 1987 Authorization Act as well as the 1980 one—that Congress as a whole intended to disfavor any abuse which rendered cost comparisons unreliable. Thus, NFFE's suit, which challenges such an allegedly unreliable cost comparison, promotes Congress' interest in choosing the most cost-effective supplier of DOD needs and is well within the zone of interests of the relevant statutory framework.

Only one circuit has addressed the question of whether federal employees have standing to challenge cost comparisons in contracting out decisions. See American Federation of Government Employees, Local 1668 v. Dunn, 561 F.2d 1310 (9th Cir.1977) (involving the contracting out of an air force cafeteria). In Dunn, the Ninth Circuit decided that the union did not have standing to assert such a claim, but it decided this without examining the 1921 Budget Act or OFPPAA or any DOD Authorization Acts. The opinion summarily dismissed plaintiff's standing to challenge cost comparisons, "for the reasons set forth earlier in this opinion." Dunn, 561 F.2d at 1315. The only standing discussion earlier in the opinion was whether plaintiff had standing to bring a different claim under the Service Contract Act. The court found that plaintiff was not within the zone of interests of that act. Id. at 1313. But since NFFE is not suing under the Service Contract Act, and since the Ninth Circuit does not appear to have considered whether federal employees are within the zone of interests of the three statutes at issue here, I fail to see what force the Ninth Circuit's decision can have on our analysis of the case before us.

Congress passed a law aimed at saving money. It established a procedure and standards for the Army to follow in seeking such savings. This court frustrates that laudable purpose by putting the procedures and standards beyond any judicial review. Because NFFE is the only party available to enforce an affirmative requirement that Congress has enacted and because nothing in any of the three statutes or their legislative histories indicates a Congressional intent to preclude NFFE's standing, I would find that NFFE satisfies the prudential requirements for standing to bring this suit, as well as the constitutional requirements. I would also find that the Army's decision to contract out the logistics work at Fort Sill is reviewable. The reviewability of OMB Circular A–76 is governed by our previous decisions. See Equal Employment Opportunity Commission v. FLRA, 744 F.2d 842 (D.C.Cir. 1984) (deciding that OMB Circular A–76 was an "applicable law" within the meaning of 5 U.S.C. § 7106(a)(2) and a "law, rule, or regulation" within the meaning of 5 U.S.C. § 7103(a)(9)(C)(ii)), cert. dismissed,

476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986); *Department of the Treasury v. FLRA,* 862 F.2d 880 (D.C.Cir.1988) (same). Section 1223(b) of the 1987 Authorization Act should also be held to be reviewable, as its limitation, requiring cost comparisons to be "realistic and fair"—meaning accurate—is no less specific than the limitation found reviewable by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 411–13, 91 S.Ct. 814, 821–22, 28 L.Ed.2d 136 (1971) (that statute prohibited use of parkland unless there was no "feasible and prudent alternative"). I would therefore reverse the decision below and remand for further proceedings.

Today's decision is a direct rebuff to the Supreme Court's § 702 jurisprudence. Not content to have tried and failed, this circuit again attempts to prune the APA's broad grant of standing, with little regard for Congress' will and with insufficient attention to the Supreme Court's or its own precedent. The decision results in a no man's land with no review by anybody for important parts of two statutes and a regulation adopted pursuant to two others. Congress never signalled that it intended or desired such a bizarre outcome. I respectfully dissent.