# Applicability of 18 U.S.C. § 208 to National Gambling Impact Study Commission

The National Gambling Impact Study Commission is not an "independent" agency for purposes of a criminal conflict of interest statute, 18 U.S.C. § 208.

January 26, 1999

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION

You have asked whether a criminal conflict of interest statute, 18 U.S.C. § 208 (1994), applies to the National Gambling Impact Study Commission ("Commission").[1] The Commission was established by the National Gambling Impact Study Commission Act ("Act"), Pub. L. No. 104–169, § 3(a), 110 Stat. 1482 (1996) (codified as amended at 18 U.S.C. § 1955 note (Supp. IV 1998)), in order to "conduct a comprehensive legal and factual study of the social and economic impacts of gambling in the United States." *Id.* § 4(a)(1). The Commission consists of nine members, of whom six are appointed by Congress (three by the Speaker of the House and three by the Majority Leader of the Senate), and three are appointed by the President. *Id.* § 3(b)(1)(A)–(C). The appointing authorities are to consult among themselves to ensure that the Commission's membership reflects, "to the maximum extent possible, fair and equitable representation of various points of view" with respect to the Commission's inquiry. *Id.* § 3(b)(3). The congressional leadership also has the predominant role in selecting the Chair of the Commission. *Id.* § 3(b)(5)(A). The Commission's responsibilities are investigatory and advisory: not later than two years after its first meeting, it must submit to the President, Congress, State governors and Native American tribal governments "a comprehensive report of [its] findings and conclusions, together with any recommendations" it may decide to make. *Id.* § 4(b). The Commission has powers to hold hearings, issue subpoenas, secure information directly from Federal agencies, employ personnel and contract with the Advisory Commission on Intergovernmental Relations and the National Research Council. *Id.* §§ 5, 6, 7. Sixty days after submitting its final report, the Commission is to terminate. *Id.* § 10.

Section 208 was enacted in 1962 as part of a general revision of the conflict of interest laws. Pub. L. No. 87–849, § 1(a), 76 Stat. 1119, 1124 (1962). In general, 18 U.S.C. § 208(a) provides that, subject to certain exceptions, "whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States . . . participates personally and substantially as a Government officer or employee, . . . [in a] particular matter in which, to his knowledge, he . . . has a financial interest," shall be

---

[1] *See* Letter for Dawn Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from Emily C. Hewitt, General Counsel, General Services Administration (Nov. 7, 1997) ("GSA Letter")

29

subject to the criminal and civil penalties provided in § 216 of title 18. We have previously concluded that the Commission is not within the executive branch.[2] Thus, the sole substantive question to be considered here is whether the Commission is an "independent" agency for purposes of § 208.[3]

We conclude that it is not. Although the reach of § 208's reference to "independent" agencies is not clear, and the legislative history is unhelpful (*see* Part I.A below), the Commission falls outside any likely construction of that section. As we discuss in Part I.B below, the Commission does not resemble the agencies whose "independence" from Presidential control was upheld by the Supreme Court in two major cases that preceded the enactment of § 208 — *Humphrey's Executor v. United Statesk, 295 U.S. 602 (1935)*, and *Wiener v. United States*, 357 U.S. 349 (1958). Nor, as we discuss in Part I.C below, do the Commissioners enjoy any form of protection from removal under the Act — and tenure protection is, for many purposes, a recognized test of "independence." Finally, as we discuss in Part II below, there is no other affirmative evidence, whether in the text of the Act or otherwise, that Congress intended the Commission to be regarded as "independent" for purposes of § 208.

I.

Section 208 applies to "an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States." 18 U.S.C. § 208(a). There are at least two possible explanations for Congress's decision to distinguish between the executive branch and "independent" agencies in this context.

First, Congress may have intended § 208 to reach all agencies of the Government other than those within the legislative or judicial branch. "[I]ndependent" agencies on this account would be those agencies that, under the Supreme Court's older jurisprudence, might have been considered to be "hybrid" agencies, outside the executive branch and performing "quasi-legislative" or "quasi-judicial" functions.[4] Under present Supreme Court doctrine, such "independent" agencies are

---

[2] *See* Letter for Ms. Kay Cole James, Chairperson, National Gambling Impact Study Commission, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel (Aug. 13, 1997). In support of that conclusion, we observed that the majority of the Commissioners were congressionally appointed; that the congressional leadership controlled the choice of the Commission's Chair; and that the Commission carried out only information-gathering and advisory functions, which need not be performed by the executive branch. *Id* at 1 We further pointed out that "[u]nder the Department's precedents, we regard such commissions as outside the executive branch. . . . Indeed, even where the congressional leadership appoints less than a majority of members, a commission such as [this] may be outside the executive branch." *Id.* (citing precedents). We remain persuaded that the Commission is outside the executive branch.

[3] The Commission is undoubtedly an "agency" within the "expansive definition" of 18 U S.C. § 6, which defines "agency" for purposes of title 18 to include "any . . . commission." *Memorandum Opinion for the Comptroller General of the United States· Conflict of Interest—18 U.S C. § 207—Applicability to the General Accounting Office*, 3 Op. O L.C 433, 434 (1979) ("GAO Opinion")

[4] This has often been characterized as the view that there is "a headless 'fourth branch' of government consisting of independent agencies having significant duties in both the legislative and executive branches but residing not entirely within either." *Ameron, Inc v U S Army Corps of Engineers*, 787 F 2d 875, 886 (3d Cir. 1986). *See also*

considered to be parts of the executive branch, although the President's power to remove agency heads may be restricted in certain ways. *See Morrison v. Olson,* 487 U.S. 654, 689–91 (1988) (interpreting cases on tenure protection for officials of independent agencies as hinging on whether protection impaired President's duty to execute the laws). Congress could have understood the term "independent agency" in 1962, however, to refer to agencies that we would now consider to be part of the executive branch. On that understanding, § 208 would apply to the executive branch, including agencies within the executive whose heads enjoy some degree of protection from presidential removal, and that may have been viewed in 1962 as outside the executive branch;[5] but it would not apply to the legislative or judicial branches.

Alternatively, in referring to "independent" agencies, Congress may have been recognizing the possibility that some agencies could be regarded as "independent" even while being firmly located within a particular branch. On this reading, § 208 would reach not only "independent" agencies within the executive branch but also any such agencies within the legislative or judicial branches.[6] The pre-1962 case law had at least occasionally noted that in order to be "independent," an agency might need to be protected from *congressional,* as well as executive, control.[7] Moreover, the cases had also suggested that an agency might be, for at least some purposes, "independent," while yet belonging to a particular branch.[8] Consequently, in applying § 208 to "independent" agencies, Congress

*id* at 892 (Becker, J , concurring in part); *Federal Trade Comm'n v Ruberoid Co* , 343 U S 470, 487 (1952) (Jackson, J , dissenting).

[5] Thus, we have no doubt that agencies such as the Federal Trade Commission ("FTC"), which *Humphrey's Executor* stated "cannot in any proper sense be characterized as an arm or an eye of the executive," 295 U S. at 628, should now be regarded as part of the executive branch

[6] We note that the Court seems usually to have understood "independent" agencies — for purposes of separation of powers analysis — *not* to encompass agencies within the legislative or judicial branches Thus, the Court has said that "independent" agencies are those whose statutes "typically specify either that . . . agency members are removable by the President for specified causes [such as the FTC] . . . or else do not specify a removal procedure [such as the Federal Election Commission]." *Bowsher v. Synar,* 478 U.S. 714, 725 n.4 (1986) By contrast, a statute "that provides for direct congressional involvement over the decision to remove" the agency head creates an entity that is not generally an "independent agency" in the constitutional sense. *See id.* Thus, at least in *Bowsher,* the Court seemed reluctant to view the Comptroller General as an "independent agency" for constitutional purposes Such a view would not negate the possibility of considering the Comptroller General to be "independent" within the meaning of § 208 — a possibility that we examine in Part I.C below. An agency might count as "independent" under a particular statutory scheme without necessarily being "independent" in the constitutional sense

[7] For example, *Williams v. United States,* 289 U S. 553 (1933), addressed the question whether a judge of the Court of Claims (a "legislative" or "Article I" court) enjoyed the tenure protection afforded to constitutional courts by Article III, Section 1 of the Constitution Although denying that Court of Claims judges enjoyed such constitutional tenure, the Supreme Court observed that "[t]he preservation of [the Court of Claims'] independence is a matter of public concern The sole function of the court being to decide between the government and private suitors, a condition, on the part of the judges, of entire dependence *upon the legislative pleasure* for the tenure of their offices . . . to say the least, is not desirable." *Id.* at 562 (emphasis added).

[8] *See Lathrop v. Donohue,* 367 U S 820, 853 (1961) (Harlan, J , concurring in judgment) (Bureau of the Budget is "independent" although within the executive branch). *See also Dobson v Commissioner,* 320 U S 489, 497 (1943) (Board of Tax Appeals was statutorily designated as "an independent agency in the executive branch of the Government"); *Railroad Retirement Bd. v Alton R. Co* , 295 U.S 330, 344 (1935) (Railroad Retirement Board was "denominated an independent agency in the executive branch of the Government"), *Goldsmith v. United States*

Continued

could have had in view those agencies, whether belonging to the executive, legislative or judicial branch, that enjoyed at least some freedom from the control of higher authorities within that branch by virtue of protections against the removal of the agencies' heads. As discussed below, this account of Congress's intent has found support in this Office's prior opinions.

We do not believe it is necessary in this memorandum to decide between these alternative readings, because the Commission does not count as "independent" under either of the alternatives we describe. Furthermore, as we discuss below, there is no evidence that Congress intended it to be considered "independent."

### A.

We begin by reviewing the legislative history of § 208. We have found little relevant history on the precise point at issue, and what little history there is sheds almost no light on it.

"Section 208 was modeled on the former section 434 of title 18, which 'disqualifie[d] an employee of the Government who has an interest in the profits or contracts of a business entity from the transaction of business with such entity.'" *Applicability of 18 U.S.C. § 208 to the Federal Communications Commission's Representative on the Board of Directors of the Telecommunications Development Fund*, 21 Op. O.L.C. 96, 98 (1997) (citation omitted). Section 434 had made no express reference to independent agencies. That reference originated in the general reform of the major federal conflict of interest statutes made by the Bribery, Graft and Conflicts of Interest Act of 1962, Pub. L. No. 87–849, 76 Stat. 1119. The legislation represented Congress's response to the perception of several serious inadequacies in those statutes (including § 434), among them the fact that they were "drafted in unnecessarily broad and imprecise ways," thus creating "uncertainties as to proper conduct and, to a degree, inconsistent practices among the departments and agencies of the Government." *Conflict of Interest Statutes: Intermittent Consultants or Advisers*, 42 Op. Att'y Gen. 111, 112 (1962) (Kennedy, A.G.).

While the reference in § 208 to "independent" agencies as well as to the "executive branch" may have been designed to make the statutory coverage more precise, we have found no explanation of what Congress specifically intended. The House Report on the 1962 law describes § 207(a) (and §§ 208 and 209) as applying to officers and employees of the 'executive branch' or an 'independent agency,' without further elaboration. *See, e.g.*, H.R. Rep. No. 748, 87th Cong., 1st Sess. 11, 12, 13, 23, 24 (1961). The Senate Report describes §§ 207, 208 and 209 as applying to present and former government employees only in very general terms. *See* S. Rep. No. 2213, 87th Cong., 2d Sess. (1962), *reprinted in*

---

*Bd. of Tax Appeals*, 270 U.S 117, 121 (1926) (Board of Tax Appeals performed "quasi judicial" functions and was within executive branch).

1962 U.S.C.C.A.N. 3852. *Applicability of Post-Employment Restrictions on Dealing with Government to Former Employees of the Government Printing Office*, 9 Op. O.L.C. 55, 56 n.3 (1985) ("GPO Opinion"). A legal commentator of the time (and participant in the framing of the legislation) observed that §§ 207–209 were to apply to officers and employees of independent agencies as well as of the executive branch, but offered no explanation for this innovation. *See* Roswell B. Perkins, *The New Federal Conflict-Of-Interest Law*, 76 Harv. L. Rev. 1113, 1123 (1963).[9]

## B.

Given that the legislative history of § 208 is unilluminating, we have considered an interpretative approach that draws on the Supreme Court's pre-1962 jurisprudence. This approach is based on the rule of construction that "[w]hen Congress codifies a judicially defined concept, it is presumed . . . that Congress intended to adopt the interpretation placed on that concept by the courts." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 813 (1989).

At the time of § 208's enactment in 1962, two major Supreme Court cases on "independent" agencies, *Humphrey's Executor* and *Wiener*, had addressed the constitutionality of statutory limitations on the power of the President to remove agency heads or commissioners. Those cases could serve to explain how § 208's reference to "independent agencies" should be construed.

In *Humphrey's Executor*, the Court upheld a statute restricting the President's power to remove a Commissioner of the FTC on grounds of "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 619. The Court held that the constitutionality of such removal restrictions turned on "the character of the office." *Id.* at 631. The Court viewed the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628. Such an agency was not "an arm or an eye of the executive"; rather, its Commissioners were expected to discharge their functions "without executive leave and . . . free from executive control." *Id.* The powers of the FTC were not "purely" executive,

---

[9] We note also that, in 1989, Congress enacted 18 U S C § 202(e)(1) (1994), which provided a definition of "executive branch" applicable to § 208 Ethics Reform Act of 1989, Pub. L No 101–194, § 401, 103 Stat. 1716, 1748. The definition reaches any "entity or administrative unit in the executive branch," but does not specifically mention "independent agency," which is not otherwise defined. Arguably, some entities previously covered by § 208 as "independent agenc[ies]" were, after the amendment, covered (in addition or instead) by the reference to the "executive branch " We do not believe that the amendment requires giving the term "independent agency" in § 208 a broader meaning than in our analysis, on the ground that otherwise all "independent agenc[ies]" would come within the reference to the "executive branch" and the term "independent agency" would be redundant First, there is no evidence indicating that, by defining "executive branch," Congress intended to enlarge the extent to which § 208 reaches entities outside the executive branch. Second, if the reference is redundant, that may merely reflect Congress's appreciation of the changes in the Supreme Court's jurisprudence marked by its 1987 decision in *Morrison* Third, as we discuss in Part I.C below, some entities outside the executive branch could be covered as "independent agenc[ies] "

but were "quasi-legislative or quasi-judicial." *Id.* Insofar as the FTC conducted investigations and reported its findings to Congress, it was acting in a quasi-legislative capacity; insofar as the statute required it to function as a master in chancery, it was acting quasi-judicially. *Id.*[10]

*Wiener* followed *Humphrey's Executor's* "sharp line of cleavage between officials who were part of the executive establishment" and "those who are members of a body 'to exercise its judgment without the leave or hindrance of any other official or any department of the government,' 295 U.S., at 625–626, as to whom a power of removal exists only if Congress may fairly be said to have conferred it." 357 U.S. at 353. The Court applied that distinction to the President's removal of a member of the War Claims Commission.[11] Although the statute creating that body said nothing about removal, the Court inferred that "Congress provided for a tenure defined by the relatively short period of time during which the War Claims Commission was to operate." *Id.* at 352. Looking to "the nature of the function that Congress vested in the War Claims Commission" to decide whether such an implied removal restriction was valid, *id.* at 353, the Court found that that agency had been created as "an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof, with finality of determination 'not subject to review by any other official of the United States or by any court by mandamus or otherwise.' " *Id.* at 354–55 (citation omitted). Because the intent of Congress was to vest the War Claims Commissioners "with adjudicatory powers that were to be exercised free from executive control," *Morrison*, 487 U.S. at 688, the implied statutory removal restrictions were constitutional.

The Supreme Court's recent case law casts doubt on the viability of the doctrinal categories used in *Humphrey's Executor* and *Wiener.* In particular, the Court now recognizes the "difficulty of defining such categories of 'executive' or 'quasi-legislative' officials," *Morrison*, 487 U.S. at 689 n.28.[12] Moreover, this Office has found the rationale of *Wiener* "questionable." [13] Nonetheless, the question here is what Congress intended in 1962 when enacting § 208, not whether the

---

[10] *See also Morrison*, 487 U.S. at 687 (explaining *Humphrey's Executor*); *Power of the President to Remove Members of the Tennessee Valley Authority From Office*, 39 Op Att'y Gen. 145, 146 (1938) (Jackson, Acting A.G.) (*Humphrey's Executor* rested on facts that the FTC "exercises quasi-legislative and quasi-judicial functions and is not a part of the executive branch", Court also stressed legislative history "indicating a purpose of the Congress to secure the maximum independence of the Commission from Executive interference and control").

[11] The War Claims Commission was established by the War Claims Act of 1948, Pub. L. No 80–896, 62 Stat 1240 Its responsibility was to hear and adjudicate certain claims arising out of enemy conduct during the Second World War.

[12] *See also Ruberoid Co*, 343 U.S at 487–88 (Jackson, J , dissenting)

[13] *The Constitutional Separation of Powers between the President and Congress*, 20 Op O.L.C 124, 168 n 115 (1996) ("Dellinger Memorandum"). Specifically, we said that "[t]he rationale of *Wiener*, which is essentially that *Congress* must have implied a for-cause removal restriction when *the Court* believes that the functions of the agency demand such tenure protection, 357 U.S at 353–56, seems questionable. There would be nothing illogical in a legislative decision, for example, to protect against review or revision of the *decisions* of the agency, *see id.* 354–55, while placing the agency's *decisionmakers* within the control of the President.   . . To the extent that *Wiener* assumes that control is and ought to be a binary matter — either plenary or non-existent — its reasoning is difficult to reconcile with more recent separation of powers decisions that reject such an either/or approach to presidential control. *Id.* We noted, however, that *Wiener* "continues to be followed" in the lower courts Id.

Constitution admits the possibility of "hybrid" agencies not belonging to any of the three branches. We think it plausible to suppose that in 1962, Congress would have understood a statutory reference to "independent agencies" to mean agencies such as the FTC or the War Claims Commission, i.e., agencies that were not then considered to be part of the executive branch, or indeed of any of the three branches.

Assuming that such was Congress's intent, we find that the Commission would not be an "independent" agency under the standards of *Humphrey's Executor* or *Wiener*. First, unlike the FTC or the War Claims Commission, the Commission exercises no functions that under *Humphrey's Executor* and *Wiener* were considered to be adjudicatory in nature. Second, the Commission exists solely to conduct a study and to report its findings and recommendations to Congress, the President, and State and tribal governments.[14] Its responsibilities are "essentially of an investigative and informative nature, *falling in the same general category as those powers which Congress might delegate to one of its own committees.*" *Buckley v. Valeo*, 424 U.S. 1, 137 (1976) (emphasis added). We think that the Commission functions much as a congressional committee does when conducting an investigation or drafting a legislative proposal based on the information it has gathered; indeed, it seems to us that, given its overall statutory structure, the Commission is a part of the legislative branch.[15] It is therefore unlike the "headless fourth branch" regulatory agency that *Humphrey's Executor* took the FTC to be.

In summary: because *Humphrey's Executor* and *Wiener* were assuredly "within the lively knowledge of Congress" when § 208 was enacted, *Wiener*, 357 U.S. at ·353, we think that they provide a plausible test of what Congress intended when referring in that section to "independent agenc[ies]." If that test is applied, then the Commission cannot be counted as "independent."

## C.

The paucity of relevant legislative history relating to § 208 leaves open a second possibility: that an agency could be considered independent under the statute if, and only if, its head (or, in cases where the agency has a collective head, the members of that body) enjoys at least some degree of protection against removal from superior officials, *whatever* the branch to which the agency belongs. In other words, the Congress that enacted § 208 may have perceived some agencies as "independent" even if they were located in a particular branch (rather than in a putative "headless fourth branch"), provided that they resembled the paradig-

---

[14] "This commission does not have the power to regulate, only to make recommendations It is a study commission, not a regulatory body " 142 Cong. Rec. 17,421 (1996) (statement of Sen Glenn).

[15] As discussed above, we have previously concluded that the Commission is not within the executive branch. *See supra* note 2 What branch a commission may fall in depends on a number of factors We do not mean to suggest here that whenever a commission's mission is to conduct a study and to report its findings and recommendations to Congress that it is necessarily legislative rather than executive

matic independent agencies with respect to tenure protection. Accordingly, agencies in the legislative or judicial branches, as well as in the executive, could be counted as "independent" under § 208. In fashioning this interpretation, we again consult the Supreme Court's pre-enactment case law. We also find support for it in several of this Office's precedents.

As construed by the Supreme Court only a year before § 208 was enacted, its precursor statute, 18 U.S.C. § 434 (Supp. II 1946), was said to be designed "to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of the public welfare." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 548 (1961). The individual with whose conflicted activities the Court was most concerned in *Mississippi Valley* was a part-time consultant to the Bureau of the Budget (the precursor of the Office of Management & Budget). At the time, the Bureau of the Budget was apparently considered to be in some sense "independent." *See Lathrop v. Donohue*, 367 U.S. at 853 (Harlan, J., concurring in judgment); *National Fed'n of Federal Employees v. Cheney*, 883 F.2d 1038, 1045 (D.C. Cir. 1989) (Bureau of Budget was "quasi-independent" entity within Treasury Department), *cert. denied*, 496 U.S. 936 (1990). Nonetheless, the Bureau of the Budget could not have been "independent" in the sense indicated by *Humphrey's Executor* and *Wiener*, if only because the Treasury Department, where the Bureau had been lodged, was plainly within the executive branch.[16] It is at least conceivable, therefore, that Congress intended § 208 to apply to certain agencies that were acknowledged to belong to a particular branch, provided that they had a sufficient resemblance to the constitutional paradigms of "independence." In particular, since protection against removal has figured in the cases as the key element in defining agency "independence," an agency in the legislative or judicial branch could be "independent" within the meaning of § 208 if its head enjoyed some form of tenure protection. *Cf. Williams*, 289 U.S. at 562.

Several of this Office's opinions have reflected this possibility, finding that particular agencies were to be considered "independent" for purposes of § 208, despite the fact that they were situated within the legislative or judicial branches. To be sure, § 208 does not ordinarily apply to officers or employees of the legislative and judicial branches.[17] Nevertheless, although an agency is within the legislative or judicial branch, we have thought that it might still be considered "independent" for purposes of § 208. Our opinions in this line are relevant to the status of the Commission under § 208, insofar as it might be argued that the Commission

---

[16] *See Power of the President to Remove Members of the Tennessee Valley Authority From Office*, 39 Op Att'y Gen at 146 (under *Humphrey's Executor*, only an agency "not a part of the executive branch" could be considered independent for separation of powers analysis).

[17] *See* GPO Opinion, 9 Op. O.L C at 56 (discussing legislative history); GAO Opinion, 3 Op. O.L C. at 435 (§ 208 and companion statutes "do not by their terms and were not intended to apply to officers and employees of the legislative and judicial branches").

is an "independent" agency in the legislative branch. As further discussed below, however, that suggestion ultimately lacks merit.

Three OLC opinions are relevant. First, in the GAO Opinion, we found that the GAO was, under § 208, an "independent" body not within the executive branch and arguably within the legislative branch. *See* GPO Opinion, 9 Op. O.L.C. at 57–58 (citing GAO Opinion, 3 Op. O.L.C. 433). The Comptroller General is removable "not only by impeachment but also by joint resolution of Congress," *Bowsher v. Synar*, 478 U.S. at 728, and consequently he or she is an officer of the legislative branch who "may not be entrusted with executive powers." *Id.* at 732. Nonetheless, it remains the case that the governing statute provides that Congress may remove that officer only for a cause such as inefficiency, neglect of duty, or malfeasance. *Id.* at 728–29. In the GAO Opinion, we analyzed the effect of the tenure protection enjoyed by the Comptroller General, together with other statutory provisions of title 31, on the status of that officer under § 208. Without denying that the Comptroller General and the GAO are "subservient to Congress," 478 U.S. at 730,[18] we found that the statute gave the Comptroller General some measure of "independence" from Congress, so that GAO officers and employees were properly considered subject to § 208. We said:

> The establishment of a fixed tenure of office, subject to removal for cause, has generally been regarded as intended to promote an element of independence of action. *Cf., Humphrey's Executor v. United States*, 295 U.S. 602, 624–26 (1935). Thus, while the Comptroller General and GAO are independent of the executive branch, they apparently are expected to be somewhat independent of the legislative branch as well. I therefore am led to conclude that whatever their status for other purposes, the Comptroller General and officers and employees of the GAO are officers and employees of an "independent agency of the United States" for purposes of 18 U.S.C. § 207 — §§ 208 and 209 as well.

GAO Opinion, 3 Op. O.L.C. at 436.[19]

Second, in the GPO Opinion, we concluded that the GPO is not "independent" for purposes of § 208. We reached that conclusion despite the fact that the Public Printer is presidentially appointed. Our analysis tracked the judicial view that the GPO is an entity within the legislative branch, whose primary function is to provide support for Congress. *See* GPO Opinion, 9 Op. O.L.C. at 57.[20] The question

---

[18] *See also id.* at 746 n.11 (Stevens, J., concurring in judgment) (Comptroller General and GAO "have a fundamentally different relationship with Congress than do independent agencies like the Federal Trade Commission")

[19] In addition, we note that former 31 U S C § 41(a) (1921) (now 31 U.S.C. § 702(a) (1994)), specifically declared the GAO to be "independent" of the executive. *See* GAO Opinion, 3 Op. O.L.C. at 436

[20] We have subsequently reviewed the status of the GPO at some length, and have again found that it is an agency within the legislative branch *See Involvement of the Government Printing Office in Executive Branch Printing*

Continued

of the Public Printer's tenure of office was not considered in this opinion, although our conclusion would have been fortified if it had been. The GPO's statute, 44 U.S.C. §§ 301–317, vests appointment power of the Public Printer in the President (subject to Senate advice and consent), but is silent as to the Public Printer's removal. By inference, therefore, the Public Printer can be removed at will by the appointing authority (i.e., the President), and does not enjoy tenure protection. *See* Dellinger Memorandum, 20 Op. O.L.C. at 172–73 (because the Librarian of Congress — like the GPO, a congressional agency — "is not protected by an explicit for-cause removal limitation, . . . we therefore infer that the President has at least the formal power to remove the Librarian at will"). Our conclusion as to the GPO can thus be read to provide some (indirect) support for the view that an agency in the legislative (or judicial) branch is "independent" for purposes of § 208 if, but only if, its head enjoys a degree of tenure protection.

A third opinion addressing the United States Sentencing Commission falls within this line. *See* Memorandum for Jamie Gorelick, Deputy Attorney General, from Teresa Wynn Roseborough, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Sentencing Commission/Conflict Rules* at 14 (July 21, 1994) ("Sentencing Commission Opinion"). There we found the Sentencing Commission, which had been established by statute as "an independent commission in the judicial branch of the United States," 28 U.S.C. § 991(a) (1994), to be an "independent" agency under § 208; *see also Mistretta v. United States*, 488 U.S. 361, 384–85, 390, 393 (1989) (Sentencing Commission held an independent agency within judicial branch). Like the GAO and unlike the GPO, the Sentencing Commissioners enjoy some degree of tenure protection: the statute "grants the President authority to remove members of the Commission, although 'only for neglect of duty or malfeasance in office or for other good cause shown.' 28 U.S.C. § 991(a)." *Mistretta*, 488 U.S. at 409. Here, too, an agency that was located outside the executive branch was found to be "independent" under § 208, and here again the agency head enjoyed tenure protection.

In the present case, this test of "independence" is not met. Nothing in the Act creating the Commission states or implies that Commissioners are to enjoy any form of tenure protection. On this reading of the statute (which, like the reading outlined in Part I, seems to us a plausible construction), the Commission is not subject to § 208.

Of the three OLC precedents considered in this Part, the GPO Opinion, holding § 208 inapplicable, closely fits the circumstances of the Commission. Moreover, the conclusion that the Commission is not "independent" for purposes of § 208 under the test considered here harmonizes with our precedents in another respect: it accords with our past view that the section does not cover those who are "properly regarded as officers or employees of the Congress or one of its Houses or

---

*and Duplicating*, 20 Op. O.L.C. 214 (1996)  More recently still, we reaffirmed the analysis of the latter memorandum. *See Government Printing Office Involvement in Executive Branch Printing*, 20 Op. O L C. 282 (1996).

agencies and who are responsible in some immediate sense to the Congress,'' such as ''those officers and employees appointed by the Congress or one House thereof to perform functions in aid of the legislative process.'' GAO Opinion, 3 Op. O.L.C. at 435–36.

## II.

We find no other reason to believe that Congress intended to subject the Commission to § 208. On the contrary, our conclusion that the Commission is not ''independent'' for purposes of § 208 is well supported by the language and legislative history of the Act.

First, nothing in the language of the Act itself designates the Commission as ''independent.'' As noted above, this distinguishes the Commission from other bodies that we have found to be subject to § 208, such as the GAO and the Sentencing Commission.

Second, the language of the Act assumes that the nine Commissioners will represent a variety of distinct and incompatible points of view with respect to gambling, and that some Commissioners will be associated with the gambling industry. Thus, section 3(b)(2) of the Act states that ''[t]he [Commission] members may be from the public or private sector, and may include . . . members of . . . industry.'' In addition, section 3(b)(3) states that the appointing authorities are to consult together ''to achieve, to the maximum extent possible, fair and equitable representation of various points of view'' on the Commission. That the Commission membership was intended to include representatives of different points of view — some of whom could be expected to have financial interests in the Commission's recommendations — does not in itself mean that § 208 is inapplicable, *see* Office of Government Ethics Informal Opinion 82 x 22 (1989 ed.). Nonetheless, the statutory criteria for Commission membership clearly indicates that Congress was not attempting to insulate the Commission from outside influences in order to ensure its ''independence.''

The legislative history confirms that understanding. The House Judiciary Committee's Report on the legislation, H.R. 497, stated:

> the Committee expects that the [appointing] authorities may consider for appointment representatives of various interested groups including, gambling proponents and opponents, state gambling regulators, federal and state prosecutors, Indian gambling operators, professionals who treat compulsive gamblers, casino operators, activists who have opposed gambling referenda, state lottery officials, and representatives of non-gambling businesses in areas around gambling operations.

H.R. Rep. No. 104–440, pt. 1, at 8 (1995), *reprinted in* 1996 U.S.C.C.A.N. 1192, 1197.

In the House debate, Representative Hyde, Chairman of the House Judiciary Committee that reported out the bill, sought to answer charges that the Commission might be skewed against the gambling industry. He said:

> I believe that this Commission can do the most good if its study is as neutral, objective, and comprehensive as possible — considering the views of all sides of this issue. In that spirit, I proposed a committee amendment in the nature of a substitute to H.R. 497, which the Judiciary Committee adopted on a voice vote.

> My substitute included the vast majority of the provisions contained in H.R. 497 as originally introduced, but it added language so as to assure that all points of view would be represented on the Commission. Specifically, the bill now requires that the appointing authorities consult together to ensure that the overall makeup of the Commission fairly and equitably represent[s] various points of view.

142 Cong. Rec. 3642–43 (1996).[21]

Thus, instead of seeking to promote public confidence in the Commission's study by requiring that the Commission be "independent" of outside influence, Congress preferred an approach in which at least some Commissioners could have open and avowed interests, biases and commitments that would check and balance those of other Commissioners. From this (partly) "adversarial" system, it was hoped that a balanced and objective study would be more likely to result. Plainly, a Commission so conceived would be very likely to include members whose personal stakes in the outcome of the Commission's work would be disqualifying under § 208, if that statute were to apply. Given Congress's careful decisions about the nature of the Commission, the statute gives no indication that § 208 was intended to apply to this advisory body.

---

[21] Similarly, in the Senate debate, Senator Coats, a supporter, stated:

> Opponents of this commission have raised many charges against it. They have claimed that the commission is a tool of the religious right. They have claimed that the commission will become a witch hunt against the gambling industry.

> Mr. President, these claims are unfounded. The appointment of commissioners will be equally divided between the executive branch and the two Houses of Congress, ensuring that no faction may dominate the work of the commission.

142 Cong. Rec. 17,425, 17,426 (1996).

## Conclusion

For all of the above reasons, we conclude that the Commission should not be considered an "independent" agency within the meaning of § 208, whichever meaning of that term is adopted, and hence is not subject to that statute.

BETH NOLAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*